[No. S097456. June 10, 2002.]

OWEN S. RICE, Plaintiff and Appellant, v.
RICHARD L. CLARK et al., Defendants and Respondents.

## COUNSEL

Law Offices of Herb Fox, Herb Fox; Mullen & Henzell, Lawrence T. Sorensen and Bret A. Stone for Plaintiff and Appellant.

Price, Postel & Parma and David K. Hughes for Defendants and Respondents.

## OPINION

**WERDEGAR, J.**—Probate Code section 21350 presumptively disqualifies, as the recipient of a donative transfer by instrument, a person who drafts the instrument (*id.*, subd. (a)(1)) or who, having a fiduciary relationship with the

transferor, "transcribes the instrument or causes it to be transcribed" (*id.*, subd. (a)(4)).[1] The issue presented in this case is whether the class of persons disqualified because they *cause* an instrument to be transcribed is broad enough to include a person who provides information needed in the instrument's preparation and who encourages the donor to execute it, but who does not direct or otherwise participate in the instrument's transcription to final written form. Like the trial and appellate courts below, we conclude the category of persons disqualified under section 21350, subdivision (a)(4) is not so broad.

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioner Owen S. Rice seeks to invalidate gifts decedent Cecilia M. Clare made by will, trust and other instruments that left Clare's entire estate to respondent Richard L. Clark (Clark) and his wife, respondent Janet A. Clark. Because the trust instrument names Rice as the contingent beneficiary if the Clarks predecease Clare, and because a person disqualified under section 21350 is treated as having predeceased the transferor (§ 21353), Rice would take under the trust if the Clarks were disqualified.

Clare, 76 years old when her husband died in 1988, owned several pieces of income-producing real property, as well as her Santa Maria home. She had no children or other close relatives. Clark, 42 years old in 1988, was working as a building inspector for the City of Santa Maria and as a handyman, and was managing his own investment properties.

Clark first met Clare in 1988, after her husband's death, when he repaired the garage door at her home. Over the next few months, he performed numerous repairs on her properties, receiving $200 per day in pay. In the summer of 1988, Clark quit his job with the City of Santa Maria, began attending a local college, and continued doing maintenance and small repair work for Clare. In 1989, having finished his course work, he worked increased hours on the Clare properties, taking on more extensive projects. From 1989 through 1993, Clare paid Clark $1,200 per week to take care of her properties.

Toward the end of 1994, Clark's weekly compensation was raised to $1,400 and he took on additional duties. He began helping Clare with her bill paying, bookkeeping, and tax information, and sometimes spoke with tenants on Clare's behalf. He began accompanying Clare to the grocery store and to the bank, which she visited several times each week. Clare also gave Clark a key to her safety deposit box. Beginning in December 1994, Clare

---

[1]All further unspecified statutory references are to the Probate Code.

wrote checks to cash and gave Clark cash gifts of about $250 to $350 per day.

In 1992, Clare executed a will prepared by Maurice Twitchell, an attorney who had previously done real estate work for her. That instrument bequeathed a farm property and personal property from Clare's home to Richard and Janet Clark, but gave the residue of the estate to Allan Hancock College in Santa Maria, to establish and endow a school of music.

In January 1995, at a meeting between Clark, Clare and Twitchell, Clark said, and Clare appeared to agree, that Clare wished to change her will so as to leave everything to the Clarks with the exception of one ranch, which she wanted to give to Rice, the longtime tenant. However, Clare, acting through Clark, fired Twitchell in March 1995 without executing a new will; Clark told Twitchell that Clare found him too "pushy."

Clare and Clark met with a new attorney, Michael Hardy, on May 4, 1995. Clark had made the appointment at the request of Clare, who had known Hardy's former partner. Hardy had heard of Clare's late husband, but did not know Clare or Clark before the meeting. Clark told Hardy that Clare wanted him to prepare a new will or a trust. During or after the meeting, Clark also gave Hardy lists of Clare's assets, including real property holdings, stocks and bank accounts.

Hardy asked Clare how she wished to leave her estate. She said she wanted to leave her entire estate to Richard and Janet Clark, or to the survivor of them if one of them died before her. If both Clarks predeceased Clare, she wanted the next contingent beneficiary to be Owen Rice. Clare, having decided she wanted a living trust, stated in answer to Hardy's question that she wanted Richard Clark to succeed her as trustee, with Janet Clark as her second choice if Richard were unable to serve. Hardy did not ask Clare about her prior estate plan or why she wanted to change it. Clark was present throughout the meeting. According to Hardy, Clare appeared mentally competent and expressed her testamentary wishes clearly.

Sometime after the May 4 meeting, Clark telephoned Hardy's office and asked the secretary to ask Hardy to prepare the necessary documents promptly. Hardy and his secretary prepared the necessary documents for a will and trust and, through Clark, scheduled a signing appointment for Clare for June 14, 1995. That morning, Clare told Clark she did not like Hardy and did not want to see him. Clark phoned Hardy about an hour before the appointment and said, "I don't think that I can get her in," but Clark and Clare arrived at the appointed time. Hardy went through the documents he

had prepared one by one. Clare did not ask any questions and seemed impatient, but appeared to understand Hardy's presentation. But when Hardy asked if she was ready to sign, she said she was not ready and left abruptly. Clark followed Clare, telling Hardy he would talk to her.

Clark and Clare picked up breakfast at a fast-food restaurant and ate it in the park, as was their custom. Clare seemed unhappy. Clark told her that any other attorney she hired would prepare the same type of documents and she would simply end up paying additional legal fees. Clare then agreed to return to Hardy's office and sign the documents. About an hour after they had left, Clark and Clare returned to Hardy's office, where Hardy briefly reviewed the documents again and Clare signed them.

The documents signed June 14, 1995, were an individual living trust instrument, a pour-over will, grant deeds transferring two of Clare's real properties into the trust, and durable powers of attorney for Clark to handle Clare's health care and financial affairs if she became incapacitated. Other deeds remained to be prepared in order to fully fund the trust. The trust instrument named Richard Clark as successor trustee. On Clare's death, the trust estate was to be distributed to Richard and Janet Clark in equal shares, to the survivor if either predeceased Clare, or to Owen Rice if both Clarks predeceased Clare.

Clare did not return to Hardy for further work in funding the trust, instead retaining Attorneys Mark Henbury and, after Henbury's sudden death, Karen Mehl to prepare the necessary documents. Mehl prepared several grant deeds conveying property into the trust, which Clare signed in October 1995. Mehl believed Clare was fully competent when she executed the deeds.

Through Henbury, Clare and Clark had been referred to a stockbroker. Clark told the broker that Clare wanted to give all her stocks to him and his wife, and that the documentation should be done in such a way that Clare, who suffered from a muscular palsy in her hand, would not have to sign numerous documents. In August 1995, with the broker's assistance, Clark used his power of attorney to transfer the 68 stock certificates into the Clare trust, after which Clare signed a transfer moving them into a separate trust established by and for the benefit of the Clarks.

In late December 1995 and early 1996, Clare's physical and mental health deteriorated sharply. Clark contacted adult protective services for help, and, in March 1996, Clare entered a nursing home. On February 28, 1996, a physician examined Clare and found her unable to manage her personal, medical or financial affairs, a conclusion with which Clark agreed. Earlier

that day, however, Clark had taken Clare to the stockbroker's office, where she signed a transfer into her trust of stock that had been missed in the earlier transactions. Also in February 1996, Clare cashed several large checks Clark had prepared and gave Clark much of the cash.

On March 28, 1996, Clark, represented by Michael Hardy, filed a petition to act as conservator of Clare's person and estate. Clare died on May 10, 1996, before the court acted on the conservatorship petition. The real property in her estate was valued at more than $4.5 million.

In an earlier proceeding, Allan Hancock College, the residuary beneficiary under Clare's 1992 will, sought to invalidate the 1995 will and trust, claiming that these instruments had been procured by Clark's undue influence. (§ 6104.) In August 1997, the superior court gave judgment for the Clarks, finding that Richard Clark had not unduly benefited from the 1995 will and trust. In light of Clare's lack of close family or other friends, the court found, Richard Clark, as Clare's "longtime employee and friend," was a natural recipient of her bounty. Rice, who was not a beneficiary of the 1992 will, was not a party to this earlier action.

In December 1997, Rice brought the present action, petitioning for a declaration that the donative transfers to the Clarks were invalid under section 21350, and to remove Richard Clark as trustee of the Clare trust, to impose a constructive trust on stocks and cash transferred to the Clarks, and for other relief. With agreement of both parties, the trial was bifurcated: the question of whether the Clarks were presumptively disqualified under section 21350 would be tried first; if the court found they were, it would then hear evidence to overcome that presumption under section 21351, subdivision (d), which allows the presumptively disqualified transferee to prove by clear and convincing evidence that the transfer was not the product of fraud, menace, duress or undue influence.

After the first phase of trial, the superior court found that Rice had not proven the Clarks were disqualified persons under section 21350.[2] The court found that Richard Clark was in a fiduciary relationship with Clare at all material times and, "because he was helpful to her and he was the closest human being in her life," had exercised considerable influence over Clare. But Clark did not meet the other criteria of section 21350. To cause an instrument to be transcribed within the meaning of section 21350, subdivision (a)(4), the trial court concluded, is to take an action "that leads directly,

---

[2]If Richard Clark were disqualified under subdivision (a)(4) of section 21350, Janet would be disqualified under subdivision (a)(5), which disqualifies a "person who is related by blood or marriage to . . . a person who is described in paragraph (4)."

substantially, and uninterruptedly to the writing down or causing to be printed the words of another." While Clark had taken part in "arranging for preparation" of the challenged instruments, he did not draft the instruments, transcribe them, or cause them to be transcribed because "he did none of the thinking or writing himself nor did he order or request any other person to do so." The court therefore entered judgment for the Clarks without making any finding on undue influence.

The Court of Appeal affirmed, rejecting Rice's contention that the trial court's definition of "causes it to be transcribed" was too narrow. The court observed that Hardy drafted the will and trust, and Hardy's secretary transcribed them at his direction. Although "[i]n the largest sense, anyone who encourages another to have a will or trust drafted can be said to be a cause of its ultimate transcription," the Legislature did not, the appellate court concluded, intend such a broad definition. "The statute was never intended to apply to every circumstance in which a fiduciary may have improperly induced an elderly person to name him beneficiary of her estate," though in such cases a common law presumption of undue influence, not raised in this case, may arise.

We granted Rice's petition for review.

DISCUSSION

## I.  Legal Background

■     The principle that a will is invalid if procured by the undue influence of another predates the 1931 adoption of the Probate Code (see, e.g., *Estate of Ricks* (1911) 160 Cal. 467, 480 [117 P. 539]), but is now codified in section 6104.[3] Undue influence is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency. (*Estate of Fritschi* (1963) 60 Cal.2d 367, 373-374 [33 Cal.Rptr. 264, 384 P.2d 656]; *Estate of Sarabia* (1990) 221 Cal.App.3d 599, 604-605 [270 Cal.Rptr. 560]; see also *Hagen v. Hickenbottom* (1995) 41 Cal.App.4th 168, 182 [48 Cal.Rptr.2d 197] [principles of undue influence applicable to estate plan formalized by simultaneously executed inter vivos trust and will].)

■     Although a person challenging the testamentary instrument ordinarily bears the burden of proving undue influence (§ 8252), this court and

---

[3]Section 6104 provides: "The execution or revocation of a will or a part of a will is ineffective to the extent the execution or revocation was procured by duress, menace, fraud, or undue influence."

the Courts of Appeal have held that a presumption of undue influence, shifting the burden of proof, arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument. (*Estate of Fritschi, supra*, 60 Cal.2d at p. 376; *Estate of Sarabia, supra*, 221 Cal.App.3d at p. 605; *Estate of Auen* (1994) 30 Cal.App.4th 300, 309 [35 Cal.Rptr.2d 557]; see also *id.* at p. 310 [where person alleged to have exerted influence was testator's attorney, any benefit other than compensation for legal services may be considered "undue"].)

Supplementing the foregoing, the Legislature in 1993 added the statutory scheme at issue in this case, part 3.5 of division 11 of the Probate Code (hereafter part 3.5), comprising sections 21350 to 21356, and substantially amended it in 1995. (Stats. 1993, ch. 293, § 8, p. 2021; Stats. 1995, ch. 730, §§ 12-17, pp. 5480-5483.) The 1993 legislation was introduced in response to reports that an Orange County attorney who represented a large number of Leisure World residents had drafted numerous wills and trusts under which he was a major or exclusive beneficiary, and had abused his position as trustee or conservator in many cases to benefit himself or his law partners. (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 21 (1993-1994 Reg. Sess.) as amended Feb. 4, 1993, p. 1.)

Section 21350 currently provides that, except as provided in section 21351, no provision of an "instrument"[4] is valid to make a donative transfer to the person who drafted the instrument (§ 21350, subd. (a)(1)), to any person having a fiduciary relationship with the transferor "who transcribes the instrument or causes it to be transcribed" (*id.*, subd. (a)(4)), or to the relative, cohabitant, law partner or employee of such drafter and transcriber (*id.*, subd. (a)(2), (3) & (5)).

Section 21351 states exceptions and conditions to section 21350's applicability. Subdivisions (a), (b) and (c) of section 21351 except from invalidity, respectively, transfers to relatives and cohabitants of the transferor, transfer instruments reviewed by an independent attorney who counsels the transferor and executes a specified certificate, and transfers approved by the court on petition of a conservator. Subdivision (d) of section 21351 permits a transferee other than the instrument's drafter (see *id.*, subd. (e)(B)) to rebut section 21350's presumption of disqualification by showing, "upon clear and convincing evidence, excluding the testimony of any person described in

---

[4]"Instrument" is broadly defined in section 45 as "a will, trust, deed, or other writing that designates a beneficiary or makes a donative transfer of property."

subdivision (a) of Section 21350, that the transfer was not the product of fraud, menace, duress, or undue influence."

Section 21353 provides that a person disqualified under section 21350 is treated as having predeceased the transferor, but may still receive the amount of his or her intestate interest, if any, in the transferor's estate. Other provisions limit liability for transfers pursuant to an invalidated instrument (§ 21352), provide that part 3.5 applies notwithstanding contrary provisions in the instrument and applies to instruments becoming irrevocable on or after September 1, 1993 (§§ 21354, 21355), and establish a statute of limitations for actions under part 3.5 (§ 21356).

The scheme set out in part 3.5 differs from the preexisting decisional law relating to undue influence (and § 6104) in several respects. Section 21350 applies to all donative transfers by instrument, not only to wills and other testamentary transfers, but it invalidates only gifts to drafters and to fiduciaries (and to persons close to them) who transcribe the instrument or cause it to be transcribed. Unlike the common law, section 21350 does not require, as the predicate for a presumption of invalidity, that the transferee would receive an "undue" benefit. The transferee, under part 3.5, bears an elevated proof burden in rebutting the presumption: he or she must show the absence of undue influence, fraud or duress *by clear and convincing evidence*, and without reliance on the testimony of any presumptively disqualified person. (§ 21351, subd. (d).) Section 21351, moreover, makes the presumption of disqualification conclusive as to a drafter-transferee. (*Id.*, subd. (e)(B).) Thus, for example, if an attorney drafted a client's will so as to benefit himself, he would (assuming no other exception in § 21351 applied) be conclusively disqualified; if he drafted the will so as to benefit his relative or law partner, the presumption would be rebuttable, but only by clear and convincing evidence other than the drafter's testimony that the client freely chose that disposition. (§ 21351, subds. (d), (e).)

II.  *Applicability of the 1995 Amendments*

As enacted in 1993, subdivision (a)(1) of section 21350 disqualified any person, including attorneys and other fiduciaries, who "drafted, transcribed, or caused to be drafted or transcribed, the instrument." (Stats. 1993, ch. 293, § 8, p. 2021.) The 1995 amendments, while retaining the disqualification of all drafters, expressly limited disqualification of transcribers, and those who cause the instrument to be transcribed, to fiduciaries. (§ 21350, subd. (a)(4), as amended by Stats. 1995, ch. 730, § 12, pp. 5480-5481.) Most important for present purposes, the 1995 amendments eliminated any reference to a person who "caused [the instrument] to be drafted."

Most of the instruments at issue in this case (including the will and trust, the deeds, and most of the stock transfers) were executed in 1995, before the January 1, 1996, effective date of the 1995 amendments.[5] Because the result in this case could differ under the pre- and postamendment versions of section 21350,[6] the question arises whether the 1995 amendments apply to instruments executed before those amendments became effective.

Section 3 provides rules for applicability of changes to the Probate Code. Subdivision (c) of section 3 states: "Subject to the limitations provided in this section, a new law [defined in subdivision (a)(1)(B) of section 3 to include an amendment to a Probate Code section] applies on the operative date to all matters governed by the new law, regardless of whether an event occurred or circumstance existed before, on, or after the operative date, including, but not limited to, creation of a fiduciary relationship, death of a person, commencement of a proceeding, making of an order, or taking of an action."

The Clarks contend that section 3, subdivision (c) mandates application of the law as amended in 1995, even though the trust and will were executed prior to that amendment's effectiveness. We agree. Under section 3, the 1995 amendments applied on their effective date to "all matters governed by" section 21350 as amended, including all donative transfers by instrument. The manifest purpose of section 3—to make legislative improvements in probate law applicable on their operative date whenever possible—would be greatly frustrated if the date of *execution* of an instrument were in all cases to fix the law applicable to the instrument's validity.

Moreover, Clare's testamentary gifts to the Clarks, through her will and trust, did not become irrevocable until her death in 1996, after the 1995

[5] It should be noted that the deeds and stock transfers moving property into the Clare trust did not themselves effectuate any gifts to the Clarks. During her life, Clare was the sole beneficiary of her revocable trust. At Clare's death, on the other hand, any stocks or real property still outside the trust would, under the terms of her will, enter the trust, to be distributed to the Clarks under the trust terms. That the deeds and stock transfers into the trust were instruments making a "donative transfer" within the meaning of section 21350 is, for this reason, doubtful. The transfer of stocks from Clare's trust to the Clarks' own trust effected a donative transfer, but Rice is not a contingent beneficiary of that transfer instrument, as he is of the Clare trust, and invalidation of those stock transfers would therefore not benefit Rice; indeed, if not effectively transferred by that instrument, the stocks would have remained in Clare's trust, to be distributed to the Clarks at her death by the terms of that trust. Our legal discussion will therefore focus on the will and trust, by which Clare effectively gave her entire estate to the Clarks.

[6] While finding that Clark did not draft the challenged instruments, transcribe them or cause them to be transcribed, the trial court observed that whether Clark *caused the instruments to be drafted*—a point on which the court made no finding—would be "a much closer question."

amendments' effective date. The Legislature's provision for applicability of part 3.5 to any instrument becoming irrevocable after September 1, 1993 (§ 21355) suggests the Legislature also intended that amendments refining part 3.5's operation would apply to instruments executed before the amendments' effective date but becoming irrevocable after that date.

Rice agrees that section 3 governs the question of the amendments' applicability, but argues for application of one or more of the statutory exceptions to section 3, subdivision (c)'s rule of retroactivity.

First, Rice points to subdivision (f) of section 3, which states that no person "is liable for any action taken before the operative date that was proper at the time the action was taken, even though the action would be improper if taken on or after the operative date . . . ." On its face, however, this exception is inapplicable for at least two reasons: the issue here is not Clark's *liability* to another for his actions, but the validity of a gift made to him and his wife; and the 1995 amendments to section 21350 *narrowed*, rather than broadened, the class of fiduciaries deemed "improper" (in the language of § 3, subd. (f)) as recipients of donative transfers.

Second, Rice argues that if the amended version of section 21350 does not apply to Clark's conduct in procuring the donative instruments (as Rice asserts the lower courts concluded), the unamended version should be applied pursuant to subdivision (g) of section 3, which states: "If the new law does not apply to a matter that occurred before the operative date, the old law continues to govern the matter notwithstanding its amendment or repeal by the new law." As amended in 1995, however, section 21350 continues to apply to all donative transfers by instrument; what has changed is the category of recipients presumptively disqualified under the statute. Under Rice's overbroad construction, the exception in section 3, subdivision (g) would swallow the general rule of retroactivity set out in subdivision (c).

Finally, Rice relies on subdivision (h) of section 3, which provides that a new law should not be applied so as to "substantially interfere with . . . the rights of the parties or other interested persons in connection with an event that occurred or circumstance that existed before the operative date . . . ." This exception is inapposite: Rice, as a contingent beneficiary, had no "right," in 1995 or anytime, to see Clark disqualified as the recipient of Clare's gifts. Moreover, as the Clarks point out, any rights Rice has as a contingent beneficiary to the Clare trust did not vest until Clare's death in 1996, when the trust became irrevocable.

We conclude the 1995 amendments to section 21350, eliminating persons who "caused [an instrument] to be drafted," apply to the disputed donative transfers in this case.

### III. *Scope of Section 21350, Subdivision (a)(4)*

█ Section 21350, subdivision (a)(4) includes in the category of presumptively disqualified persons any fiduciary who "transcribes the instrument or causes it to be transcribed." There being no contention that Clark falls within any other provision of section 21350, subdivision (a), we must decide whether the lower courts were correct in interpreting subdivision (a)(4) as too narrow to include Clark.

"Transcribe" is, in the present context at least, clear enough in meaning: "To make a copy of (something) in writing; to copy out from an original." (18 Oxford English Dict. (2d ed. 1989) p. 392; see also Webster's 3d New Internat. Dict. (1981) p. 2426 ["1 a : to make a written copy of . . . [;] b : to make a copy of (dictated or recorded matter) in longhand or esp. on a typewriter"]; Black's Law Dict. (7th ed. 1999) p. 1503 ["To make a written or typed copy of (spoken material, esp. testimony)"].) Neither party proposes a meaning different from this, or suggests the Legislature used the term in any way other than its ordinary meaning.

There is no evidence that Clark actually transcribed any donative instrument. Michael Hardy, the attorney who prepared the will and trust, testified that after the first meeting with Clare, no one other than Hardy and his secretary worked on the preparation, drafting, or transcription of the instruments. The secretary's testimony was in accord; though Clark telephoned after the first meeting to request that document preparation be expedited, the secretary actually prepared the instruments at Hardy's direction. Similarly, there was no evidence that Clark took a hand in physically preparing the stock transfer instruments or the deeds by which Clare conveyed real properties into her trust. The question, then, is whether Clark can be said to have "caused" the instruments' transcription.

"Cause" does not have as clear a meaning as "transcribe." As was observed in *Estate of Swetmann* (2000) 85 Cal.App.4th 807 [102 Cal.Rptr.2d 457] (*Swetmann*), the only published decision addressing the precise question before us, "[t]he concept of causation has been given various meanings in the law, ranging from an indirect, peripheral contribution to an immediate and necessary precedent of an event." (*Id.* at p. 818.)

Here, the lower courts construed "cause to be transcribed" as limited to direct involvement in the instrument's transcription, as by ordering another person to transcribe a document. This was in accord with the *Swetmann* court, which concluded that "a person who causes the document to be transcribed is one who directs the drafted document to be written out in its

final form and, like the transcriber, is in a position to subvert the true intent of the testator." (*Swetmann, supra,* 85 Cal.App.4th at pp. 819-820.) Rice, on the other hand, argues that a person causes an instrument's transcription if he "makes use of other persons to draft and transcribe the instruments, and . . . then persuades the testator to execute them." In short, Rice argues, *Swetmann*'s interpretation was too narrow: the presumption of disqualification should apply to any fiduciary "whose conduct is a substantial factor in the creation or execution of the donative instruments."

In *Swetmann,* the elderly testator's next-door neighbor and conservator, who had for many years helped the testator and his wife with errands and who exercised the testator's power of attorney, arranged for the testator to meet with an estate planning firm, provided information to the estate planner regarding the testator's financial affairs, and paid the planning firm from the conservatorship account. The conservator did not, however, directly participate in preparing the resulting will and trust. (*Swetmann, supra,* 85 Cal.App.4th at pp. 810-814.)

The appellate court concluded the conservator had not caused the will or trust to be transcribed, within the meaning of section 21350, subdivision (a)(4), because "none of [his] activities pertained to the physical preparation of the documents." (*Swetmann, supra,* 85 Cal.App.4th at p. 820.) Unlike a drafter, transcriber, or person who directs the instrument's transcription, the conservator was not peculiarly positioned "to subvert the true intent of the testator." (*Ibid.*) His involvement in the will and trust's preparation thus came within neither the spirit nor the letter of section 21350. (*Swetmann,* at p. 822.)

Because of the ambiguity inherent in the term "causes," neither party's construction of the statute can be absolutely excluded by the plain language. Our interpretation must in addition be guided by an understanding of the legislative purposes and history. (*Swetmann, supra,* 85 Cal.App.4th at p. 818.)

In light of those purposes and that history, we agree with the *Swetmann* court's analysis of section 21350. As already noted, the genesis of Assembly Bill No. 21, by which section 21350 and the rest of part 3.5 were added to the Probate Code, lay in the reportedly egregious self-dealing of a probate attorney representing numerous elderly clients. Existing law was perceived to be insufficiently clear and certain in addressing such conduct. The "overriding intent" of the new law, according to a committee report, was "to clearly and unambiguously prohibit the most patently offensive actions of

[the attorney] while not unreasonably encumbering the practice of probate law." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 21 (1993-1994 Reg. Sess.) as amended June 17, 1993, p. 5.) The bill would do so, its author stated, by " 'strictly forbid[ding] attorneys from drafting (or causing to be drafted) wills that leave themselves, or relatives or business partners, any gifts.' " (*Ibid.*)

Part 3.5 was thus structured to be more absolute in certain respects, but narrower in the persons targeted, than the preexisting law under section 6104. It is more absolute in that all gifts, not only those involving an undue benefit to the transferee, are presumptively invalidated; in that the presumption of disqualification is conclusive as to drafters; and in that others subject to the presumption must prove absence of undue influence or fraud by clear and convincing evidence and without relying on their own testimony. It is narrower in applying only to drafters and to fiduciaries (and persons close to them) involved in the instrument's transcription, and in excluding relatives of the transferor, whereas the preexisting law (§ 6104) invalidates testamentary gifts procured by *any* recipient's undue influence or fraud. Part 3.5, in short, supplemented existing law by adding an especially strict prohibition focused relatively narrowly on a particular class of transferees.

While part 3.5, like the preexisting section 6104 and case law, is intended to help protect elderly and infirm testators against fraud, duress and undue influence, the new law focuses more specifically on those who directly participate in the preparation of a donative instrument, because "such participants are in a position where they can easily control or influence the distribution of property under the instrument to their benefit and contrary to the true intent of the trustor or testator." (*Graham v. Lenzi* (1995) 37 Cal.App.4th 248, 257 [43 Cal.Rptr.2d 407].) While virtually anyone acquainted with a testator might in some circumstance use fraud, duress or undue influence to obtain a testamentary gift—a gift that would be ineffective under section 6104 and the decisional law—those who directly participate in the instrument's physical preparation, whether by drafting or transcribing it, are particularly well situated to insert gifts to themselves, their families or business associates, and to secure the instrument's execution. Transcription—the process of reducing an instrument to final written form— "obviously carries with it the opportunity to fraudulently alter the terms of the document to the transcriber's advantage." (*Swetmann, supra,* 85 Cal.App.4th at p. 819.) In the same manner, one who *directs* an instrument's transcription can easily cause the inclusion of provisions benefiting him- or herself, as can a person who drafts an instrument. Only as to this restricted class of persons directly involved in the donative instrument's physical

preparation did the Legislature, in enacting part 3.5, prohibit the receipt of gifts by a stricter standard than the preexisting law provided.

Our conclusion is reinforced by the amendment history of section 21350. As noted above, the originally enacted version of section 21350 presumptively disqualified certain persons who "drafted, transcribed, or caused to be drafted or transcribed, the instrument." (Stats. 1993, ch. 293, § 8, p. 2021.) The 1995 amendments, among many other changes, removed the reference to a person who "caused [the instrument] to be drafted." (Stats. 1995, ch. 730, § 12, pp. 5480-5481.) The definition of "cause to be transcribed" Rice urges us to adopt, which includes any person "whose conduct is a substantial factor in the creation . . . of the donative instruments," would include as well any person who "caused [the instrument] to be drafted," at least as Rice urges causation be understood. As the Legislature has deliberately removed one category from its description of the persons to be disqualified, we should not interpret a remaining category to effectively reinsert it.

According to legislative committee materials relating to the 1995 amendments, the impetus for deleting "caused to be drafted" was the apprehension that a person might be deemed to have caused a trust's drafting, and hence be disqualified as trustee of the trust (see § 15642, subd. (b)(6) [trustee's inclusion in § 21350, subd. (a) is grounds for removal]), merely by virtue of having referred the trustor to the attorney who drafted the trust. (Assem. Com. on Judiciary, Worksheet on Assem. Bill No. 1466 (1995-1996 Reg. Sess.) pp. 3-4 (Worksheet); Michael V. Vollmer, former chair, Cal. State Bar, Estate Planning, Probate & Trust Law Section, letter to Larry Doyle, Cal. State Bar, Mar. 29, 1995, p. 2 [incorporated in Worksheet].) More generally, the changes were described as "clarify[ing]" the disqualification categories of section 21350, subdivision (a). (Worksheet, at p. 3; Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1466 (1995-1996 Reg. Sess.) as introduced Feb. 24, 1995, p. 6.) Rice argues that such a clarifying amendment should not be construed "to weaken the statutory protection of elders from fiduciaries who participate in drafting or executing the instruments."

We agree that the 1995 amendment to section 21350, subdivision (a) was not intended to "weaken" part 3.5's protections. The amendment *was* intended to, and did, clarify that section 21350, subdivision (a) did not apply to persons, even fiduciaries, who merely *facilitate* the making of a donative transfer by instrument without actually participating in the instrument's preparation. Were we to adopt Rice's "substantial factor" view of causation in this context, we would contravene the intent of both the original law and

the 1995 amendments by expanding the law beyond its narrow focus on a donative instrument's drafting and transcription.

Rice protests that under the lower courts' construction only an instrument's drafter, by instructing another person to transcribe the instrument, may qualify as a person who caused the instrument's transcription, rendering redundant either section 21350's disqualification of drafters or its disqualification of those causing transcription. We disagree. Though the drafter of an instrument may in many instances transcribe it or direct its transcription as well, these roles are not *necessarily* identical. A fiduciary could, for example, receive the draft of a will or trust from the attorney-drafter and have a third party type the instrument. If the executed instrument included a gift to the fiduciary, he or she would be within the scope of section 21350 as a person who caused the instrument to be transcribed, but not as the instrument's drafter. Similarly, one attorney might draft a donative instrument, be discharged by the client, and give the draft instrument to the client's new attorney, who would edit the draft and direct his or her staff to transcribe it. The first attorney would be the instrument's drafter, the second attorney a person who caused the instrument to be transcribed. That such instances may be less common than those in which a single person drafts an instrument and directs its transcription does not make any part of section 21350, subdivision (a) superfluous.

Clark did not direct or oversee, or otherwise participate directly in, the will's or trust's transcription. Both instruments were transcribed by Hardy's secretary at Hardy's direction. Clark facilitated the instruments' preparation and execution by giving Hardy's office a list of Clare's assets that were to be placed in the trust, and by arranging appointments for Clare and driving her to them. He urged Hardy's secretary to prepare the documents promptly after the May 4, 1995, meeting. He encouraged Clare to execute the will and trust after she initially balked at doing so on June 14, 1995. Clark was present at meetings where the disposition of Clare's estate was discussed, but he did not direct Hardy, or anyone else, to include any particular gifts or other provisions in the instruments. In short, Clark materially assisted Clare to dictate the contents of her will and trust to an attorney and to execute the instruments drafted by the attorney, but did not himself directly participate in transcribing the instruments. For this reason, as the lower courts concluded, he did not "cause[] [the instruments] to be transcribed" within the meaning of section 21350, subdivision (a)(4).

## DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.