Filed 6/20/2016

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| KIM BUTLER et al., | 2d Civil No. B259534 |
| Plaintiffs and Respondents, | (Consolidated with B263752) |
| | (Super. Ct. No. 1383524) |
| v. | (Santa Barbara County) |
| JOHN F. LeBOUEF, | |
| Defendant and Appellant. | |

An ethical estate planning attorney will plan for his client, not for himself. (See *Estate of Moore* (2015) 240 Cal.App.4th 1101, 1103.) A license to practice law is not a license to take advantage of an elderly and mentally infirm client. As we shall explain, the factual findings of the trial court compel the conclusion that appellant used his license to take advantage of an elderly and mentally infirm person to enrich himself. The trial court factual findings are disturbing, fatal to appellant's contentions, and suggest criminal culpability.

John F. LeBouef, an attorney, appeals a probate judgment invalidating a will and living trust purportedly executed by John Patton on December 22, 2006. Probate Code section 21380[1] (formerly 21350) provides in pertinent part: "A provision of an instrument making a donative transfer to any of the following persons is presumed to be the product of fraud or undue influence: [¶] (1) The person who drafted the instrument;

---

[1] All statutory references are to the Probate Code unless otherwise stated.

[¶] (2) A person in a fiduciary relationship with the transferor who transcribed the instrument or caused it to be transcribed." Patton's will and trust name appellant as the principal beneficiary to a $5 million estate. After five weeks of testimony, the trial court factually found that appellant, acting as Patton's attorney and fiduciary, drafted or transcribed the 2006 will and trust. (See *Rice v. Clark* (2002) 28 Cal.4th 89, 97 [discussing former section 21350, subd. (a)]; *Graham v. Lenzi* (1995) 37 Cal.App.4th 248, 255.) In a Supplemental Statement of Decision, the trial court factually found that appellant caused the loss of the original trust instrument, which made it impossible for the court to determine the true terms of the trust. The trial court declared the will and trust invalid and removed appellant as trustee. Appellant was ordered to turn over the trust assets and pay $1,256,971 attorney fees pursuant to section 21380, subdivision (d). We affirm this judgment.

In a postjudgment order, the trial court approved appellant's trust accounting but denied his request for trustee fees, attorney fees, and reimbursement for out-of-pocket expenses and property management services. It ruled that an award for fees, costs, services, and out-of-pocket expenses would be inequitable and reward appellant for his misconduct. We affirm this order.

*Facts and Procedural History*

Kim Butler and Julie Butler Black are the nieces and last known heirs-at-law of John A Patton. After Patton passed away in 2011, Butler, Black, and Carol Archer filed a petition to invalidate a $5 million donative transfer to appellant (Prob. Code, §§ 17200, 6104, 15642) and remove appellant as trustee of the John A. Patton Revocable Trust, dated December 22, 2006. Respondents claimed that appellant, an attorney, drafted or transcribed Patton's will and trust to enrich himself.

John Patton, a renowned interior designer, died in Santa Barbara on June 18, 2011. He was 73 years old, in poor health, and suffering from depression, alcohol abuse, hepatitis, diabetes, high blood pressure, gout, and incontinence. Patton's housekeeper testified that he was more often drunk than sober during the last six months of his life. He would drink heavily, howl like a dog, and fall down and injure himself.

2

Neighbors had to pick him off the floor, help him out of his car, and shower him. Patton grieved the 2004 death of his domestic partner, Leo Duval, and, by the end of his life, was often emotionally out of control.

Appellant was Patton's social acquaintance. After Duval died, appellant took an active interest in Patton and frequently drove up from Los Angeles to visit and stay the night. Appellant's life partner, Mark Krajewski, accompanied appellant on many of the visits. Krajewski was also appellant's business partner. They owned property in Los Angeles and Buenos Aires, maintained joint checking and investment accounts, shared a cell phone plan, and used the same post office box.

As Patton's health deteriorated, appellant and Krajewski visited more frequently. Patton complained that appellant was overbearing and visited too often. In 2010, Patton told his assistant, Neely Bermant, that he was losing control of his finances and that appellant had moved his money around.

On December 22, 2006, Patton allegedly changed his will and created a trust naming appellant principal beneficiary. He gifted a vintage car to Donald Pooler, appellant's friend. It was a radical change in Patton's estate plan. In 1994 and 2000 Patton executed wills gifting his estate to his nieces and Wendy Greenstein, Patton's friend for 20 years.

*Prior Questionable Estate Plans and Administrations*

Respondents argued that it was not the first time that appellant befriended an elderly person and drafted a will or trust naming himself or his partner, Krajewski, principal beneficiary. Respondents claimed there were eight prior incidents. Pursuant to Evidence Code section 1101, subdivision (b), the trial court exercised its discretion and limited the prior acts evidence to two trust matters (the Irene Grant Trust and Audrey Cook Trust). Appellant drafted both trust instruments.

In 1999, appellant helped Irene Grant inherit $2.5 million from Walter Pick. Grant was Pick's caretaker. Pick's will, which was drafted by appellant, gifted the estate to Grant. After Pick died, appellant married Grant who was 20 years older and managed the inheritance. Before Grant passed away in 2006, appellant drafted Grant's trust

3

naming himself principal beneficiary. Appellant received the bulk of the estate on Grant's death and gave $800,000 to $1 million to Grant's niece in Buenos Aires. The niece was told that Grant wanted her to receive the entire estate but appellant kept some estate assets. Appellant also collected Grant's social security benefits for the next seven years.

In 2003, appellant befriended Audrey Cook, an elderly widow, and wrote four amendments to the Audrey Cook Trust. The fourth trust amendment, written in August 2006, left most of Cook's estate to Krajewski and named appellant's friend, Donald Pooler, as successor trustee. When 90-year old Cook passed away in 2007, Pooler sold the house and distributed the $1.3 million sale proceeds to Krajewski. Family members sued, contending that the house was not a trust asset. Krajewski settled, paying more than $1 million to the family.

Rick Jong, Cook's friend and accountant, testified that Cook did not know Krajewski and would have never gifted $1 million to a stranger. Jong was Cook's trustee and learned about the trust amendment removing him as trustee after Cook died. Appellant told Cook that Pooler was a retired judge who specialized in trustee work. Pooler was actually an insurance investigator and good friends with appellant and Krajewski. Pooler lived next door to appellant for a number of years and before that, lived in an apartment building owned by Krajewski. The building was gifted to Krajewski pursuant to the James Gravett Trust that was drafted by appellant.

Sandra Homewood, a forensic document examiner, testified that the same idiosyncrasies (misspelled words, unusual sentence structure, grammatical and punctuation errors, font irregularities) were in the Cook and Patton Trust instruments. Homewood opined that it was virtually certain that the Patton trust was produced by the same "entity" that produced the Cook trust.

*Staged Burglary - Loss of Original Trust Document*

Appellant defended on the theory that Patton's will and trust were drafted by an attorney whose identity was unknown. Alice Bennett, an attorney and Los Angeles Superior Court mental health referee, was a friend of both appellant and Patton. Patton

4

asked her to prepare estate planning documents but Bennett recommended that he use a Santa Barbara attorney. In 2009, Patton mailed Bennett some estate planning documents for safekeeping. Bennett received the will, abstract of trust, and original trust instrument and was surprised that the trust named Bennett as successor trustee. After Patton died, Bennett turned the documents over to appellant and received a $500 check drawn on Patton's bank account. Appellant claimed that the original trust document was lost in a burglary just before his deposition. But the trial court rejected this theory.

*Trial Court Findings*

In a 56-page statement of decision, the trial court rejected the defense theory at trial based upon appellant's testimony. It factually found: 1. appellant "participated in the [trust] instrument's physical preparation by either drafting or transcribing it within the meaning of Probate Code section 21380," 2. that the donative transfers were drafted by appellant or subject to some form of tampering, and that section 21380 disqualified appellant as a beneficiary, 3. that the loss of the original trust instrument was "intentional," making it impossible for the court to determine the true terms of the trust, and 4. that the December 22, 2006 trust, to the extent it otherwise exists, was invalid.

As to the "missing trust" document, the trial court said that it was "key evidence" and instrumental in understanding appellant's involvement in Patton's estate plan. Examination of the original Trust "could have laid considerable concerns to rest, including one of particular importance: whether a single page . . . containing the disposition of the assets in the trust, had at some point been substituted." It said that the trust document and appellant's laptop "went missing in the course of a very peculiar burglary from a house filled with valuable objects, wherein only a handful of random items were taken, including said laptop, and an unsecured plastic box of random documents, that just happened to include the items necessary to a full understanding of the facts of this matter."

5

*Prior Bad Acts Evidence*

Appellant contends that the trial court erred in receiving evidence concerning the Grant and Cook Trusts to show common plan or scheme. (Evid. Code, § 1101, subd. (b).) In each trust matter, appellant befriended an elderly person and drafted or helped draft a trust that benefited himself or his associates. Prior bad acts evidence is admissible to show a common plan or scheme if the probative value of the evidence outweighs the potential for prejudice. (Evid. Code, §§ 1101, subd. (b); 352; *People v. Hovarter* (2008) 44 Cal.4th 983, 1002; *Hassoldt v. Patrick Media Group, Inc.* (2000) 84 Cal.App.4th 153, 165, fn. 11 [rule applies in civil and criminal cases].)

*In Estate of Zalud* (1972) 27 Cal.App.3d 945 (*Zalud*), a will contest, defendant was named as the principal beneficiary on a printed will executed by an elderly woman, Pearle Zalud. Although defendant was not related to Zalud, the will was witnessed by defendant's brother and nephew. (*Id.*, at p. 949.) None of Zalud's prior wills were written on a printed form or named defendant as a beneficiary. (*Id.*, at p. 953.) Over defendant's objection, evidence was received that defendant and his brother were principal beneficiaries in wills executed by two other elderly women, Winifred Wells and Florence Sammons. (*Id.*, at p. 955.) Defendant denied knowing how the wills were prepared even though they were typed on the same Wolcott form used by Zalud. One will was actually typed on defendant's typewriter. The trial court found: "We have got preparation, plan, knowledge. I think this is admissible both on the question of credibility of the witness and also under Section 1101 of the Evidence Code." (*Id.*, at p. 956.) The Court of Appeal held that the prior wills were admissible to impeach defendant's testimony that he had no knowledge about the preparation of Zalud's will. (*Ibid.*) "Irrespective of whether [defendant] had committed any wrong insofar as either the Wells will or the Sammons will was concerned, his connection with each will supported the inference that he had knowledge of the availability of the Wolcott forms which could readily be used in the preparation of a will without recourse to the services of a lawyer. It was an unusual circumstance that in three instances he would have some relationship to a will which was prepared on such a form, the named testator in each

6

instance not being related to the principal beneficiary and provisions having been inserted in each form which contain striking similarities to provisions so inserted in one or both of the other will forms." (*Id.*, at p. 956-957.)

Like *Zalud*, the Pick and Cook trusts were admissible to show a common plan or scheme and to impeach appellant's testimony that he did not know who drafted Patton's will and trust. The Patton trust, like the Grant and Cook trusts, named appellant or Krajewski primary beneficiary. Pick's will, which was drafted by appellant, named Grant (Pick's caregiver) as the beneficiary and appellant as executor. Appellant married Grant, managed her finances, and drafted Grant's trust naming himself beneficiary. Appellant's long time friend, Donald Pooler, assisted in the administration of the Pick estate and received Grant's Mercedes Benz after Grant passed away.

Pooler and Krajewski were key players in the Cook trust. The fourth trust amendment, which was drafted by appellant, named Krajewski as principal beneficiary and Pooler as successor trustee. Before Pooler and Krajewski were sued by the family, Pooler sold the Cook family residence and distributed the sale proceeds ($1.3 million) to Krajewski.

Appellant used other friends to witness and safe keep Patton's will and trust. Appellant's friend, Miriam Olivares, stated that she just happened to drive up from Los Angeles and witness Patton's will on December 22, 2006. The trial court found that Olivares' testimony had a rehearsed quality and the whole scenario of Olivares making a spontaneous trip to Santa Barbara to witness the will was "rather improbable. . . ."

Appellant continued to utilize friends and associates in his estate planning. Patton allegedly signed the trust the same day (December 22, 2006) but his signature was not acknowledged by a notary until July 25, 2008, 19 months later. Alice Bennett, another of appellant's associates, purportedly kept the original will and trust until Patton died. The trial court found "this case paints a picture of a group of people whose paths crossed an unusual number of times in matters concerning the testamentary estates of others. While the prior estate incidents occurred over a 25 year or more period, they do represent an unusual confluence of estate activity in this group. . . . [T]he two most

7

recent [incidents], concerning the estates of Irene Grant and Audrey Cook, offered probative information."

The trial court reasonably concluded that the probative value of the prior acts evidence substantially outweighed the potential for prejudice. "The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules. [Citations.] We will not overturn or disturb a trial court's exercise of its discretion under section 352 in the absence of manifest abuse, upon a finding that its decision was palpably arbitrary, capricious and patently absurd. [Citations.]" (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314; see also *Estate of Gilkison* (1998) 65 Cal.App.4th 1443, 1448-1449 [abuse of discretion standard on appeal].) Appellant makes no showing that the prior acts evidence, as a matter of law, were remote in time, or inflammatory, or denied him a fair trial. (See e.g., *Estate of Zalud, supra*, 27 Cal.App.3d at p. 955 [similar wills dating back nine years].)

2006 was a busy year for appellant marked by an unusual confluence of estate planning. The Grant Trust came to fruition in 2006 when Grant died and appellant was gifted the trust money. Appellant also drafted Cook's fourth trust amendment in 2006, naming Krajewski as principal beneficiary. Patton's will and trust were written and purportedly signed in 2006, "gifting" the bulk of the estate to appellant. The physical similarities between the Cook Trust and Patton Trust were striking. The trial court found that the Patton Trust was drafted "much in the image of the Audrey Cook Trust."

Even without the admission of the facts relating to the Grant and Cook prior acts evidence, it is not reasonably probable that appellant would have received a more favorable result. (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1244-1246.) This is so because the forensic document examiner, Homewood, considered, without objection, the Cook Trust as an exemplar of appellant's work. Homewood was "virtually certain" that the Cook and Patton Trusts were prepared by the same person. Homewood explained that the degree of certainty was equivalent to the "beyond a reasonable doubt" standard used in criminal cases. Because it was

8

uncontroverted appellant drafted the Cook Trust, it took no leap in logic for the trial court to factually find that appellant drafted or transcribed the Patton Trust. We are bound by this "adverse factual finding." (*In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1099.)

*Substantial Evidence*

Appellant argues that the evidence does not support the finding that Patton's will and trust was the product of fraud or undue influence. The power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, that supports the judgment. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874; see also *In re Marriage of Martin* (1991) 229 Cal.App.3d 1196, 1200.)

Section 21380 prohibits donative transfers to broad categories of persons who, because of their relationship with the settlor/trustor, might exercise undue influence. Undue influence is presumed where the donative transfer is in favor of the person who drafted the instrument or where the person who transcribed it or caused it to be transcribed had a fiduciary relationship with the settlor/trustor. (§ 21380, subd. (a)(1)-(2).) The presumption may be rebutted by clear and convincing evidence that the donative transfer was not the product of fraud or undue influence. (§ 21380, subd. (b).) Where the donative transfer is to the person who drafted the donative instrument, the presumption is conclusive. (§ 21380, subd. (c); see *Rice v. Clark, supra*, 28 Cal.4th at p. 98 [discussing former section 21351; "if an attorney drafted a client's will so as to benefit himself, he would . . . be conclusively disqualified"].)

Substantial evidence supports the finding that appellant drafted or transcribed Patton's Trust even though the original trust document was "lost" in a burglary.[2] Respondents argued that appellant switched a trust page to make himself

---

[2] On April 24, 2012, appellant reported that Patton's house was burglarized and that the burglar took the original trust document and a laptop computer used by appellant to prepare trust documents. The burglary occurred just before appellant was scheduled to produce the document for his deposition and a forensic examination. The police

9

trustee and residuary beneficiary. The trial court drew the inference that the burglary was staged to thwart a forensic document examination. Appellant denied it but the trial court found that appellant's "credibility is seriously tainted. . . . [T]he court concludes that yes, [appellant] worked with PATTON on the December 22, 2006 trust, and/or tampered with the document at some point, which necessitated the burglary."

The trial court credited Homewood's expert testimony that it was "virtually certain" that the Cook and Patton Trusts were prepared by the same entity. Homewood was "absolutely certain" appellant wrote the certificate of trust and was "positive" that appellant filled out Patton's Fidelity account application and the American Express beneficiary designation form. Homewood was virtually certain that the Cook and Patton abstracts of trust were produced by the same source, as was Patton's will. Homewood opined that the signature on Patton's will was "non-genuine" and that the staple holes in the upper left corner of the document were caused by someone stapling and unstapling the will numerous times. Homewood stated that the witness page (i.e., the page signed by appellant's friend, Miriam Olivares) had an extra set of staple holes and was added to the will "but was not originally with those first three pages."

Expert testimony also linked appellant to the grant deeds used to fund the trust. (See ante, p. 4).[3] This was strong circumstantial evidence that appellant drafted or

suspected it was a staged burglary because nothing else was taken and the house was made to look like it was ransacked. Expensive watches and art work were in plain sight but were not taken.

Discrepancies also existed as to when appellant called 911 to report Patton's death. Krajewski testified that he and appellant drove to Santa Barbara in Krajewski's BMW that afternoon, Patton's neighbor, however, testified that appellant arrived in the morning and was driving a Ford Expedition. Appellant was deposed and admitted arriving at Patton's house at 8:30 in the morning. The trial court found the time discrepancies troubling because it suggested that appellant spent hours in Patton's house before reporting the death.

[3] Homewood opined that appellant prepared the following documents and forms which were used to fund Patton's trust: a December 22, 2006 grant deed transferring Patton's Santa Barbara house and rental property to the trust; certificates of trust for various

transcribed the trust to enrich himself. Appellant had a fiduciary relationship with Patton and represented him in a felony DUI case in 2008. Patton told his housecleaner that appellant was his lawyer.

Before his death, Patton told friends and neighbors who was getting what when he died. Wendy Greenstein, a close friend, telephoned Patton daily. Patton said that he was leaving one of his Santa Barbara homes to Greenstein. Patton made similar statements to his assistant, Neely Bermant, who worked for Patton in 2008 and 2009. In 2009, Patton told Bermant that he had "just signed documents" gifting his home to appellant and everything else to Bermant, Butler, and Greenstein. "Everything else" included two other homes, bank and stock accounts, and valuable jewelry and art. In March 2010, Patton asked Bermant to make a list of all the property in the house and told her who would get what. Bermant prepared the list and Patton signed it.

Patton's June 18, 2011 death was unexpected. Appellant spent hours in Patton's house before calling 911 to report the death. The trial court drew the inference that appellant looked for and tampered with the will and trust before making the 911 call. (See ante, p. 10, fn. 2.) More suspect, was the purported theft of the original trust document and appellant's laptop computer after Patton's death. Nothing else was taken even though expensive art and watches were in open sight. The trial court found that the loss of the original trust document was "intentional" and that appellant's testimony was obstructive. "[T]he aroma of mendacity permeated this matter. . . . [I]t was the testimony of LEBOUEF that created the greatest concern."

---

banks; a Fidelity account application; an American Express form designating appellant as Patton's beneficiary and authorizing appellant to withdraw money on Patton's death; the $500 check drawn on Patton's account for Bennett; a Discover Bank signature card with a pay on death provision in favor of appellant. The trial court noted that there were two abstracts of trust, both purportedly signed by Patton on December 22, 2006. "One is silent as to the identity of the successor trustee, the other names [appellant]. The same signature page, bearing the identically erroneous notary acknowledgment, is attached to each. Both [abstracts] were, according to expert Homewood, virtually certain to have been produced by the preparer of the Audrey Cook Trust."

11

Appellant's claim that another attorney drafted Patton's will and trust was refuted in other ways. Like Sherlock Holmes' "dog in the night" that failed to bark (2 Doyle, *Silver Blaze,* The Annotated Sherlock Holmes (Baring-Gould, ed. 1967) pp. 277, 280), the absence of estate planning documents showed that something was amiss. (See e.g., *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1380.) Assuming that Patton hired another lawyer to draft the will and trust, one would expect to see billings, correspondence, a check for legal services, an estate planning questionnaire, and the lawyer's name on the estate planning documents. Lawyers who draft trusts typically put page numbers on the trust instrument. Patton's trust, like the Cook trust amendment, was not paginated and contained the same misspellings and punctuation errors.

Because the gift to appellant would have been disallowed under the Probate Code, any competent attorney drafting the trust would have had a second attorney review the trust and talk to Patton, and sign a certificate of independent review. (§21384, subd. (a); see *Jenkins v. Teegarden* (2014) 230 Cal.App.4th 1128, 1137.) Appellant's probate expert, Attorney Marilyn Anticouni, testified that a certificate of independent review "is a simple solution to a problem with big consequences."

Appellant testified at his deposition that he did not know what a certificate of independent review was. This bolstered respondents' claim that appellant drafted Patton's trust. At trial, appellant altered his testimony and said he was familiar with certificates of independent review. The trial court found the testimony "disingenuous" and concluded that appellant had a significant hand in the preparation of Patton's will and trust. If appellant "was aware of the concept . . . , why would he be filling out beneficiary designation forms, direct testamentary documents, without independent review? If [appellant] was aware, it bolsters the likelihood that the clumsy jumble that is the Patton Trust needed to appear self-drafted by PATTON."

*Implied vs. Express Findings*

Appellant complains that the statement of decision contains no express findings that respondents made a prima facie showing to shift the burden of proof under section 21380. (See *Bernard v. Foley* (2006) 39 Cal.4th 794, 800 [statutory presumption

12

of fraud/undue influence shifts the burden of proof].) Appellant did not object and is precluded from raising the issue for the first time on appeal. (Code Civ. Proc., § 634; *Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1380.) Code of Civil Procedure "'[s]ection 634 clearly refers to a party's need to point out deficiencies in the trial court's statement of decision as a condition of avoiding such implied findings . . . .' [Citation.]" (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59.) Waiver aside, the substantial evidence standard of review applies to express and implied findings of fact in a statement of decision. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.)

*Attorney Fees*

Appellant argues that the trial court erred in awarding respondents $1,256,971 attorney fees. Section 21380, subdivision (d) provides that "[i]f a beneficiary is unsuccessful in rebutting the presumption, the beneficiary shall bear all costs of the proceeding, including reasonable attorney fees." Subdivision (c) provides that the presumption of fraud or undue influence is conclusive where the donative transfer is to the person who drafted the will or trust.

Appellant argues that he is not liable for fees because the presumption is conclusive for "drafters" and he had no opportunity, as a matter of law, to rebut the presumption. (§ 21380, subd. (c).) The argument fails because a presumption is not evidence and is not operative until basic facts are established that give rise to the presumption. (Evid. Code, § 600, subd. (a).) "'A conclusive presumption is in actuality a substantive rule of law.' [Citation.]" (*People v. Dillon* (1983) 34 Cal.3d 441, 474.)

The trial court found that appellant either drafted or transcribed the estate planning documents and beneficiary forms.[4] Appellant could have negated or rebutted

---

[4]   A person who drafts a will or trust is not the same as a person who causes it to be transcribed. "Causing a document to be transcribed means directing a drafted document to be written out in final form." (14 Witkin, Summary of Cal. Law, Wills and Probate (10th ed. 2005) § 303, pp. 389-390.) One who directs or causes the drafted document to be written out, like the [drafter], is in a position to subvert the true intent of the testator

13

the presumption of undue influence a number of ways. He could have produced a certificate of independent review which trumps the section 21380 presumption. (§ 21384, subd. (a); *Jenkins v. Teegarden, supra*, 230 Cal.App.4th at p. 1137.) In the alternative, appellant could have presented evidence that he did not draft or transcribe the will and trust or beneficiary forms. The fact that the trial court discredited appellant's testimony that some other attorney drafted Patton's will and trust does not mean that appellant was denied the opportunity to rebut the presumption of undue influence.

Appellant contends that "drafters" are not liable for attorney fees but that would undermine section 21380, subdivision (d). The drafter who benefits from a donative transfer is held to the strictest standard because he or she has the greatest opportunity to exercise undue influence. Former 21350, subdivision (e) provided that the fee provision did not apply to a person who drafts the donative instrument but the rule changed in 2011 with the enactment of section 21380. (Stats. 2010, ch. 620, § 7.) Subdivision (d) states, without exception, that a beneficiary who is unsuccessful in rebutting the presumption, "shall bear all costs of the proceeding, including reasonable attorney fees." It matters not whether the presumption affecting the burden of proof is rebuttable or conclusive. In construing the statute, we "apply reason, practicality, and common sense to the language at hand. If possible, the words should be interpreted to make them workable and reasonable. [Citations.]" (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1239.)

*Excessive Fees*

Appellant claims that the $1,256,971 fee award is excessive because two attorneys on respondents' trial team were inexperienced and billed for duplicative work. The trial court reduced the fees by 20 percent to account for duplicated services and services that could have been done by a paralegal. Appellant makes no showing that the trial court erred in not reducing the fee award further. The case was complicated and

---

and is subject to section 21380, subdivision (b). (*See Estate of Swetmann* (2000) 85 Cal.App.4th 807, 819-820 [discussing former section 21350].)

14

contentious, involved three years of litigation, a five week trial, more than thirty-five witnesses, and two statements of decision.

Appellant complains that co-counsel, attorney Andrea Hurd, was a new attorney and billed at the rate of $250 an hour. The trial judge had ample opportunity to observe Hurd's performance and gauge the value of her services. Appellant cites no specific evidence that a 20 percent reduction in fees is too little or that Hurd's services were not worth $250 an hour. (See e.g., *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 562.) Because an experienced trial judge is in a much better position that an appellate court to assess the value of legal services rendered in his or her court, the fee award will not be set aside absent a showing that it is manifestly excessive. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1509.) "'The only proper basis of reversal of the amount of an attorney fees award is if the amount awarded is so large or small that it shocks the conscience and suggests that passion and prejudice influenced the determination.'" (*Ibid.*) Appellant makes no showing that the fee award is excessive or shocks the conscience.

*Appellant's Trustee Fees, Attorney Fees and Out-of-Pocket Costs*

Appellant contends that the trial court abused its discretion in denying his request for trustee's fees and attorney fees and not reimbursing him for out-of-pocket costs. Although the trust provides for the payment of reasonable trustee's fees, the trust is void. Section 15681 provides that "[i]f the trust instrument does not specify the trustee's compensation, the trustee is entitled to reasonable compensation under the circumstances." Where the trustee commits a breach of trust, the trial court may deny the trustee all compensation. (*Estate of Gump* (1991) 1 Cal.App.4th 582, 597, fn. 16; *Conservatorship of Lefkowitz* (1996) 50 Cal.App.4th 1310, 1314-1315.) Even when fees and costs are well-documented, they are only chargeable against the trust when they benefit the trust. (*Whittlesey v. Aiello* (2002) 104 Cal.App.4th 1221, 1227.) "[L]itigation seeking to remove or surcharge a trustee for mismanagement of trust assets would not warrant the trustee to hire counsel at the expense of the trust. Such litigation would be

15

for the benefit of the trustee, not the trust." (*Ibid*.) The same principle applies to void wills in which the executor/beneficiary opposes a will contest to enrich himself. (See e.g., *In re Estate of Higgins* (1910) 158 Cal. 355, 358.) An award of fees and costs to the executor would be inequitable. (*Ibid*.; *Whittlesey v. Aiello, supra*, 104 Cal.App.4th at p. 1228.)

The evidence shows that appellant enriched himself at the expense of the trust and pursued litigation to promote his own self-interest. (See e.g., *Estate of Vokal* (1953) 121 Cal.App.2d 252, 259-260.) As trustee, appellant used Patton's home rent free for three years (a $200,000 loss in rental value), failed to maintain property insurance on three houses, ran up gardening and repair costs ($50,000), spent $14,000 of trust money to pay his own utility bills, and spent $503,000 of estate funds on his own defense. When Patton's assistant, Neely Bermant, made a creditor's claim for unpaid services and offered to settle for $20,000, appellant spent $119,698 in defense fees and costs before settling for $20,000. "Such a spare-no-expense strategy calls for close scrutiny on questions of reasonableness, proportionality and trust benefit. 'Consequently, where the trust is not benefited by litigation, or did not stand to be benefited if the trustee had succeeded, there is no basis for the recovery of expenses out of the trust assets.' [Citation.]" (*Donahue v. Donahue* (2010) 182 Cal.App.4th 259, 273; see e.g., *Estate of Moore, supra,* 240 Cal.App.4th at p. 1105 [trustee may only incur fees and expenses that are reasonable in amount and for the appropriate benefit of the trust].)

The trial court reasonably concluded it would be inequitable to award appellant trustee fees and attorney fees for services that benefited no one other than appellant. (See e g., *Terry v. Conlan* (2005) 131 Cal.App.4th 1455, 1461.) The fees, costs, and expenses spring from appellant's fraud, concealment, and misconduct. "No one can take advantage of his own wrong." (Civ. Code, § 3517.)

Appellant complains that the trial court erred in not reimbursing him for out-of-pocket expenses and property management services. None of the expenses were documented with billings, invoices, canceled checks, or specific check account numbers. (*Estate of McCabe* (1950) 98 Cal.App.2d 503, 505 [any doubt arising from trustee's

16

failure to keep proper records, or from the nature of the proof he produces, must be resolved against trustee].)  The out-of-pocket expenses include $1,961.16 in funeral costs purportedly paid in cash, $3,800+ in "Sea Grass uppers" (carpet) for an unknown address, the $854.21 cash purchase of a dishwasher, and a $622.29 gas range.  Appellant requested $15,519.75 for managing two rental properties over a three year period and $5,400 for the "management" of Patton's residence ($150 per month x 36 months).  Appellant used the house rent free for three years.  The trial court did not err in disallowing the claim for out-of-pocket expenses and property management services.  (*Estate of Vokal* (1953) 121 Cal.App.2d 252, 260-261 [award for fees for services to a trust will not be disturbed absent a showing of a palpable abuse of discretion].)  A trustee "is strictly prohibited from engaging in transactions in which the trustee's personal interests may conflict with those of the beneficiaries without the express authorization of either the trust instrument, the court, or the beneficiaries.  [Citation.]  It is no defense that the trustee acted in good faith, that the terms of the transaction were fair, or that the trust suffered no loss or the trustee received no profit."  (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 905-906.)

*Conclusion*

Appellant's remaining arguments have been considered and merit no further discussion.  The judgment, and the postjudgment order, are affirmed.  Respondents are awarded costs on appeal and reasonable attorney fees in an amount to be determined, on noticed motion, by the trial court.  The clerk is directed to forward a copy of this opinion to the California State Bar (Bus. & Prof. Code, § 6103.6) and the district attorney for the County of Santa Barbara.  We express no opinion on discipline and/or the decision to initiate criminal prosecution.

CERTIFIED FOR PUBLICATION.


YEGAN, J.

We concur:


GILBERT, P. J.


PERREN, J.

18

Colleen K. Sterne, Judge

Superior Court County of Santa Barbara

_____

Law Offices of Michael P. Ring & Assoc., Michael P. Ring; Weldon & Hass, Scott B. Fooks, for Defendant and Appellant.

The Law Office of John Derrick, John Gregory Derrick, for Plaintiffs and Respondents.