106 Cal.App.3d 669 (1980)
165 Cal. Rptr. 207
Estate of ROSE AIELLO, Deceased.
CLAUDIA KING, as Administratrix With the Will Annexed, etc., Petitioner and Respondent,
v.
R.R. MORELAND, Objector and Appellant.
Docket No. 57656.
Court of Appeals of California, Second District, Division Five.
June 6, 1980.
*671 COUNSEL
Paul Jay Fukushima for Objector and Appellant.
Hitchcock, Bowman & Poole and Robert Schachter for Petitioner and Respondent.
*672 OPINION
KAUS, P.J.
R.R. Moreland appeals from a judgment declaring that $34,988.75, which had been deposited in a joint tenancy savings account, was held by him in a constructive trust for the beneficiaries named in decedent Rose Aiello's will, and ordering that he transfer the sum to the estate.
In a last will and testament executed on January 22, 1968, decedent named R.R. Moreland of Moreland's Mortuary as her executor. The will contained three significant provisions. First, Moreland's Mortuary was to "have charge of [decedent's] funeral and... all expenses for funeral and of [her] illness [were to] be taken care of first." Second, the balance of the estate was bequeathed in equal shares to her nephew, Alphonsus Apuzzo, and her niece, Florence Exner, both of New York. Third, her sister Maria Apuzzo was to receive a bequest of $1. The will was witnessed by two ladies who worked in Moreland's funeral establishment.
Shortly after the will was executed  on February 9, 1968  decedent converted her savings account to a joint tenancy account in which she and R.R. Moreland were named as "joint tenants with right of survivorship."
Mrs. Aiello died on February 11, 1978. An investigation by the public administrator revealed that her assets at the time of her death consisted of $5.63 and the bank account held in joint tenancy with Moreland, which contained $34,988.75.
Some communication ensued between the attorney for the named beneficiaries and Moreland's attorney. The beneficiaries requested that Moreland, as the executor designated in the will, initiate formal probate proceedings. Moreland's attorney responded that because only $5.63 would pass under the terms of the will, a "formal judicial-type probate will [not] need to be opened." Upon motion of the beneficiaries, one Claudia King was named administratrix of the estate and the will was admitted to probate on July 14, 1978.
On July 27, 1978, the administratrix filed a petition requesting the court to determine the ownership of the money held in the joint tenancy bank account. (Prob. Code, § 851.5.) The petition alleged that at the *673 time decedent created the joint tenancy account she "did not understand the nature of a joint tenancy account and did not intend said account to become the property of the surviving joint tenant...." It charged that decedent was induced to create the joint tenancy by "fraud, undue influence and duress." The petition prayed the court to decree that Moreland held the proceeds of the account in trust for the estate of Rose Aiello and to order him to convey the money to the estate.
At the hearing on the administratrix' petition, much of the evidence was documentary in nature. Bank records showed that during the 10 years between the time that the joint tenancy account was created and decedent's death, no deposits were made and a total of $676 was withdrawn, no single withdrawal totalling more than $100. After the date of her death, three withdrawals were made: $1,510.92 on February 27, 1978, $27,477.83 on April 5, 1978, and $6,000 on May 15, 1978. The final withdrawal caused the account to be closed.
Also admitted over hearsay and "remoteness" objections by Moreland were four letters written by decedent to Alphonsus Apuzzo and to one "Anna," apparently Alphonsus' wife. A letter dated February 22, 1967, stated in pertinent part: "Altho I feel fine, I may slip away. Seems we all go that way, and as far as it goes I wish to inform you that all things are well done such as my burial. I will lay with Joseph my brother.... I have my business in the hands of my mortician, he is my administrator. What else could I do with you all 3000 miles away? I was thinking of Al as my administrator if he were willing. I could still change it as I am still of sound of [sic] mind and under no duress. The reason I quote is, the administrator will take his cut and then inheritance tax moves in...."[1]
Two letters  one dated June 19, 1969, and another dated February 18, 1972  contained only general family news and expressions of personal warmth. The final letter, dated August 23, 1973, contained the following sentence: "If I should pass on my mortician will notify you, as *674 you are the only one I can depend on and I do have a will made out to you and Florence."
The deposition of R.R. Moreland, taken on September 29, 1978, was filed with the court at the time of the hearing. In the deposition, Moreland indicated that he knew the decedent only casually "through church." He could not remember any business relations with her except that she visited his office once "to make arrangements for pre-need." He did not remember that she actually signed a preneed funeral contract at the time, though he did learn of such a contract after she died. He knew nothing about her financial condition. He did not know whether she made out a will when she came to his office and had never seen a copy of a will purportedly executed by her. He never discussed a will with her. She did, however, tell him that she wanted him to help her in her business affairs.[2] One time she asked him to go to the bank with her. There he was asked to sign a deposit card which already had her name on it. He did not ask her why she was adding his name to her account.
On the question of whether he knew how much money was in the account, Moreland contradicted himself. Twice he admitted that he found out how much was in the account.[3] Each time, however, he retracted after interjections by his counsel, and finally stated that as far as the joint account was concerned, he did not know how much money was in it, "maybe she had $15, $20, or $50, or something like that, piddly things." He never discussed the account with her after his name was added to it and forgot all about it. Near the end of the deposition, in response to a question by his own attorney, Moreland testified that the decedent intended that he use the money "to help the poor people... that didn't have money to get buried."
*675 After considering all the evidence, the court made the following statements: "It is quite evident to the Court from reading the letters that at all times the object of her bounty were to be those who were mentioned in her Will.
"It is quite evident in one letter that she comes right out flatly and states that Mr. Moreland is going to take care of her affairs, because he's the only one present and she doesn't want to create a burden on her folks back East, and that he will take his cut and, then, the inheritance tax people will come along and what's left will go to those named in the Will.
"The deposition, the testimony given at the deposition by Mr. Moreland relative to the signature card, is absolutely incredible. I just can't believe it. I'm satisfied that she didn't even know what a joint tenancy was.
"There was never at any time, based upon what I have seen and what I have heard, any intention on her part that her estate should go to Mr. Moreland.
*676 "The petition is granted. The court finds that Mr. Moreland holds the bank funds as a constructive trustee for the benefit of the estate."
The court then ordered Moreland to transfer the funds to the estate and ordered the estate, in turn, to reimburse Moreland for funeral expenses, public administrator charges, and inheritance tax.

DISCUSSION
Moreland claims that the trial court committed prejudicial error in admitting the letters and that its finding that Moreland held the proceeds of the joint account under a constructive trust is not supported by the evidence. We disagree with both contentions.
(1), (2) Whether the constructive trust was imposed on a theory of fraud  actual or constructive  undue influence, duress, or, more politely, mistake, decedent's intent in joining Moreland as a cotenant to the account was of vital importance. The letters clearly indicate that her intent was that the heirs named in the will should receive the bulk of her estate  the account  and that Moreland was to be no more than an administrator who would get "his cut" as decedent put it in her first letter. While the letters were surely hearsay as to decedent's intent, they were just as surely admissible under section 1250 of the Evidence Code. (Whitlow v. Durst (1942) 20 Cal.2d 523, 525 [127 P.2d 530]; Estate of Anderson (1921) 185 Cal. 700, 718-720 [198 P. 407].)
(3) Moreland also claims that the letters were "too remote." By this he seems to mean either that they were irrelevant, or that some of them were written too long after the events of early 1968. We have already disposed of the issue of relevancy. The fact that the last letter was written some five years after 1968, does not detract from its probative value: rather, it shows convincingly that decedent's intent had not changed from what it had been at the time Moreland's name was added to the account.
(4) Nor is there any merit to the claim that the evidence does not support the findings. While the trial court obviously found much of Moreland's testimony to be incredible, he had admitted enough to show that a confidential relationship existed between himself and decedent who asked him to act as a business advisor and who, indeed, named him as her personal representative in her will. These circumstances, together *677 with the obvious advantage gained by Moreland, trigger the presumption of section 2235 of the Civil Code that Moreland received legal title as the surviving joint tenant under "undue influence." The imposition of a constructive trust is appropriate on that basis alone (Civ. Code § 2224).
This analysis makes it unnecessary to spell out in any detail the sufficiency of the evidence for imposing a constructive trust on any other basis, such as fraud. Very briefly, however, it clearly could be found that it was Moreland's duty, as a fiduciary, to explain to decedent that the legal effect of making him a joint tenant was not a preneed probate of her estate which would cause her property to be distributed to her relatives, but rather a present gift to him. (Vai v. Bank of America (1961) 56 Cal.2d 329, 342 [15 Cal. Rptr. 71, 364 P.2d 247].) That he did not do so is proved not only by obvious inferences from his own testimony, but also by decedent's continued belief that her relatives would be the beneficiaries of her bounty.
Moreland points out that Financial Code section 852 creates a rebuttable presumption that the survivor of a joint tenancy account is the owner of the money on account. From what we have said so far, it is clear that in our opinion there was ample evidence to rebut that presumption.
Affirmed.
Stephens, J., and Hastings, J., concurred.
Appellant's petition for a hearing by the Supreme Court was denied July 30, 1980.
NOTES
[1] The date of February 22, 1967, is puzzling. There is no evidence that the decedent had any direct contact with Moreland before early in 1968. He himself testified to but one visit by her "around 1968...." The most logical explanation for the date is that decedent made the common mistake of referring to the old year during the early weeks of the new one. Thus explained, the date of February 22 makes a lot of sense since it comes within a few days after the will was signed and Moreland named as joint tenant to the account.
[2] The entire passage read as follows:

"Q. Did she ever tell you she wanted you to take care of her business affairs?
"A. Help her, yeah.
"Q. She wanted you to help her in her business affairs?
"A. Yes.
"Q. And how did she want you to help her?
"A. Well, just exactly the way she said it.
"Q. To put your name on the bank account?
"A. That was one of the ways. That wasn't the one I was meaning. I was meaning taking her places and seeing about things that she wanted to see about."
[3] "Q. Did you subsequently go back to that bank?

"A. No  In a matter of maybe a couple weeks or three weeks.
"Q. You went back to the same bank; is that correct?
"A. That's right.
"Q. With Rose Aiello?
"A. No, myself.
"Q. You went back by yourself?
"A. Mm-hmm.
"Q. Why did you go back by yourself?
"A. Well, I've done business at the bank for 52 years and I went back to see what her account was and what amount of  how much money we had.
"Q. Did the bank tell you?
"A. Yes.
"[Moreland's counsel.] Whose account, Mr. Moreland?
"THE WITNESS: Beg your pardon:
"[Moreland's counsel.] Whose account were you speaking about?
"THE WITNESS: My account....
".... .... .... .... . .
"Q. Did you ever go back to the Bank of America in Compton to ask about this account?
"A. Go back?
"Q. Yes.
"A. No, no reason to go back. I found out what I wanted to find out when I was there.
"A. [Moreland's counsel.] You'd better refer to which account.
"Q. [Respondent's counsel.] Let me rephrase that question. I am talking about her bank account.
"A. No. I'm talking about my bank account...." (Italics added.)