Filed 11/12/20  Bakkers v. Bakkers CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| MICHAEL Y.C. BAKKERS et al., | |
| Plaintiffs and Respondents, | G058261 |
| v. | (Super. Ct. No. 30-2017-00902317) |
| GABY J.P. BAKKERS et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Edward W. Hall, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Law Office of John A. Belcher and John A. Belcher for Defendants and Appellants.

No appearance for Plaintiffs and Respondents.

Gaby J.P. Bakkers[1] and her son, Jeffrey Parham, appeal from a judgment after the trial court ruled in favor of Gaby's siblings, Michael Y.C. Bakkers, Andrew Bakkers, and Joyce Leidelmeyer in their petition to invalidate certain documents and confirm their parents trust. Gaby and Jeffrey argue the trial court's conclusion various documents were obtained by undue influence was erroneous.[2] None of their contentions have merit, and we affirm the judgment.

## FACTS[3]

### A. Substantive Facts

The Bakkers, who were real estate investors, were married for over 70 years and had six children, four of whom are parties to this litigation: Michael, Andrew, Joyce, and Gaby.[4] The Bakkers primary residence was located at 244 Juanita Way, Placentia, CA 92870 (the Bakkers' residence). Gaby lived across the street at 237 Juanita Way, Placentia, CA 92870 (Gaby's residence). The Bakkers helped Joyce, Gaby, and Andrew purchase homes.

In January 1989, the Bakkers created a trust that provided for two specific bequests and the balance of the trust property to be distributed to Michael, Andrew, Joyce, and Gaby.

---

[1]     Because the parties share the same last name, and for clarity and convenience, we refer to the parties by their first names, except when referring to Paul Bakkers (Father) and Joan Bakkers (Mother) and collectively as the Bakkers.

[2]     Michael, Andrew, and Joyce did not file a respondent's brief.

[3]     On our own motion, we take judicial notice of the record in the nonpublished opinion *Bakkers v. Bakkers* (Jan. 24, 2019, G054865) [nonpub. opn.] (*Bakkers I*). (Evid. Code, § 452, subd. (d).)

[4]     The other two siblings are Inge J.P. Cornelius (deceased) and Marjorie J.P. Waclawick.

In February 2009, the Bakkers created a new trust, The Bakkers Living Trust (Trust). The Trust's typewritten portion stated Joyce, Andrew, and Gaby were to each receive a one-third interest. However, the Trust included in handwriting Michael's name, and a new distribution—one-quarter interest each to Michael, Joyce, Gaby, and Andrew. The Trust's typewritten portion stated Andrew was successor trustee but the handwritten portion stated Michael was first successor trustee and Andrew was second successor trustee.

In March 2012, the Bakkers purchased an investment property at 1907 Whitman Drive, Placentia, CA 92870 (Whitman Property). Andrew owned the Whitman Property, which was going into foreclosure. Michael was the realtor, and Michael's girlfriend (Girlfriend) was Father and Mother's agent. Andrew transferred the Whitman Property to Girlfriend, and she transferred the Whitman Property to the Bakkers. In January 2013, the Bakkers executed a grant deed giving Michael joint tenant ownership rights in the Bakkers' residence. (*Bakkers I, supra,* G054865.)

In May 2013, Father, Mother, Michael, and Gaby had a meeting where they discussed, in Dutch, the Bakkers testamentary intent. The meeting was video recorded.[5] During the meeting, Father stated he gave houses to Michael and Andrew. He said Gaby used her "$200,000," and asked, "You used it right? $280,000." He added Gaby bought a house for "almost $300,000[]" and he gave her the rest "as a gift." Father stated he gave Joyce $200,000 to buy a house but she only spent $100,000, and he would give her the balance. The conversation turned to the Bakkers remaining cash reserves, about $400,000. Mother said to divide it among the four children. Father said, "[Michael] take care of me as well as her, without my finances from Holland. [¶] That's the only thing I ask in exchange for this house." Father told Gaby he gave Michael the Bakkers' residence in exchange for him caring for them and Michael could "use [his] money . . .

_____
[5] Later, the meeting was translated and transcribed.

3

[and] everything of [his]." Father said, "Oh yeah Gaby, so what? [¶] And now about you what do you want . . . to bring up? [¶] What do you want to know?" Gaby replied, "Nope, I want nothing to do with it. [¶] I'll see what crumbs are gonna [*sic*] be thrown my way."

In September 2013, the Bakkers amended the Trust (2013 Trust Amendment). The 2013 Trust Amendment stated Michael was first successor trustee and Andrew was second successor trustee. The 2013 Trust Amendment provided Joyce, Gaby, Andrew, and Michael would each receive a one-quarter interest in the estate.

In January 2014, Father exhibited signs of dementia. A doctor made a primary diagnosis of dementia and referred him to a neurologist and prescribed him medication. Father did not see the neurologist or pick up the medication.

On April 30, 2014, the Bakkers executed a reconveyance of Gaby's residence to Gaby (2014 Reconveyance). In June 2014, the Bakkers moved into Gaby's residence so she could care for them.

On August 13, 2014, the Bakkers executed a restatement and amendment of the Trust (2014 Trust Amendment). At this time, the Bakkers were both in their early 90's. The 2014 Trust Amendment named Mother and Gaby as trustees, and if both ceased to serve as trustees, Jeffrey would serve as trustee. The 2014 Trust Amendment made five bequests of real estate, one bequest of an investment account, and one bequest of a trust account. The 2014 Trust Amendment provided Joyce, Gaby, and Andrew would each receive a one-third interest in the residue of the estate. The 2014 Trust Amendment stated Michael and Inge's heirs were disinherited. Father and Mother also executed power of attorney and health care directives naming each other for asset decisions, and each other, Gaby, and Jeffrey for health care decisions.

The day after the Bakkers executed the 2014 Trust Amendment, Mother sought temporary elder abuse restraining orders for her, Father, Gaby, Jeffrey, and Joyce

4

against Michael.  The court granted the temporary restraining order as to the Bakkers but denied it as to the others.

At the October 20, 2014, hearing on the elder abuse restraining orders, Mother testified Michael improperly took $1 million and the Bakkers' residence.  Mother wanted all her children to get the Bakkers' residence.  On cross-examination, Mother admitted Father told Michael that upon both of their deaths, the Bakkers' residence belonged entirely to Michael.  Mother said Gaby and Jeffrey helped her with her finances.  After Michael's counsel asked Mother a couple questions about the Bakkers' Trust documents, counsel asked, "And was there a modification to that [T]rust recently, just about a month and a half ago?"  Mother replied, "No modification that I know of."  Counsel asked whether she knew the Trust was recently amended and Gaby was trustee.  Mother answered, "It's not changed."  Joyce testified that since the Bakkers moved in with Gaby, it was difficult for Joyce to visit them.  Joyce stated that since July 2014, she was not allowed to be alone with Mother.  Andrew testified Jeffrey would not let him see his parents alone.  After hearing argument, Judge Kim R. Hubbard denied the request for a restraining order because there was insufficient evidence of abuse.

In November 2014, the Bakkers executed an "Exercise of General Power of Appointment" (2014 Power of Appointment).  (All caps. omitted.)  The 2014 Power of Appointment made two $100,000 bequests, one to Joyce and one to Andrew.  It distributed the residue of the Trust property to Gaby (two-thirds) and Jeffrey (one-third).

In December 2014, the Bakkers executed a document forgiving Gaby's $200,000 debt for the purchase of 237 Juanita Way, Placentia, CA 92870 (2014 Monetary Gift).  The documents titled, "The Bakkers Living Trust Gifts of Tangible Personal Property," stated the $200,000 note secured by a deed of trust on Gaby's residence was "to be forgiven on our demise."

In March 2015, the Bakkers executed an "Exercise of General Power of Appointment" (2015 Power of Appointment).  (All caps. omitted.)  The 2015 Power of

5

Appointment distributed the Trust property to Gaby (two-thirds) and Jeffrey (one-third). It disinherited Michael, Marjorie, Joyce, Andrew, and Inge's heirs.

Mother passed away on May 30, 2016. Father passed away December 15, 2017.

## B. Procedural Facts

After Mother but before Father passed away, Michael, Andrew, and Joyce filed a petition against Gaby and Jeffrey. The petition sought to do the following: (1) invalidate the 2014 Reconveyance, the 2014 Monetary Gift, the 2014 Trust Amendment, the 2014 Power of Appointment, and the 2015 Power of Appointment; (2) confirm the 2013 Trust Amendment; (3) remove Gaby as trustee and Jeffrey as second successor trustee; (4) order a trust accounting; and (5) order Gaby and Jeffrey to return all Trust assets.

In *Bakkers I, supra,* G054865, we affirmed the trial court's ruling on Father's causes of action against Michael for cancellation of interest and quiet title. In that case, the court cancelled Michael's joint tenancy interest in the Bakkers' residence and restored title to the 2013 Trust. The court also cancelled deeds of trust on the Bakkers' residence and the Whitman Property.

Trial began on this case three months later. Michael, Andrew, and Joyce were in propria persona.

## 1. Michael's Testimony

Michael testified Father never selected Gaby as trustee or executor because he believed her to be incapable. He added Father did not intend to provide for his grandchildren. Michael testified that on May 22, 2013, there was a meeting between Father, Mother, Michael, and Gaby, and the Bakkers intended to divide their estate in fourths and Michael was to care for them. He stated that in 2012, Father began to forget people and occasions, and lose things. He said Mother suffered from macular degeneration, was "basically . . . blind," and they had to read to her. He stated Father

6

worked in real estate investments, and he would help his father. Father took care of their finances, but Michael assisted him. Michael would check to determine if there were liens on the Bakkers' properties, which is how he found the 2014 Reconveyance and the 2014 Monetary Gift. He said that in late 2013 or early 2014, Gaby began to care for the Bakkers for $600 per month, although she wanted $2,000 per month. Michael stated that beginning in July 2014, Gaby and Jeffrey would not let him see his parents.

On cross-examination, Michael testified concerning the Bakkers withdrawing $350,000 to purchase the Whitman Property to avoid foreclosure. Michael admitted Girlfriend acted as a "straw person" to purchase the property and transfer it to the Bakkers.

*2. Brian Mandel's Testimony*

Attorney Brian Mandel testified concerning his representation of Mother. Mandel stated another attorney referred Mother to him and in preparation for the meeting Mandel reviewed a deed for the Bakkers' residence indicating Father, Mother, and Michael were joint tenants. Mandel said Gaby and Jeffrey brought Mother to the meeting, but they did not try to influence him and he spoke to Mother alone. Mother told Mandel that Michael procured the deed to the Bakkers' residence through trickery. Mandel also reviewed the 2014 Trust Amendment, a doctor's report for Father indicating he was incapacitated, and a doctor's report for Mother. Mandel admitted he was not a doctor, but stated he believed "[Mother] knew exactly what she was talking about." Based upon Father's incapacity and Mother's desire to amend the Trust to disinherit Michael and change the distributions, Mandel prepared the 2014 Power of Appointment and the 2015 Power of Appointment to disinherit Michael and change the beneficiaries. Mother executed the 2014 Power of Appointment on November 24, 2014, and it was notarized by Mandel's partner. Mother left the meeting with the 2015 Power of Appointment and signed it on March 3, 2015.

7

*3. Mother's Testimony and Exhibits*

The parties stipulated a transcript of the video recording of Mother's October 29, 2015, deposition could be admitted into evidence. The deposition was part of Michael's unsuccessful action to obtain a conservatorship for Mother. The video was played but not reported. The trial court also admitted exhibits into evidence.

Mother testified Michael stole $1 million from them and Girlfriend was "not [her] favorite." She added she never forgave Gaby's debt. Mother said she began losing her sight three years earlier and had been blind for one year. She said people need to read to her and tell her where to sign things. After Mother said she had to ask the person what the document is about, she added, "And if I like what I hear and it's all right, I always ask Gaby, 'Do you want me to sign it? Where do I sign?' [¶] And she says that '[b]etween these two lines.'" She added that she did not always sign documents Gaby asks her to sign, but she could not offer a specific example. She said she wanted Gaby and Jeffrey to get her assets when she passed away and Gaby could decide how her assets should be divided. Everyone, including Gaby and Father, told her that Michael was stealing money from them. She stated Jeffrey was studying to be a lawyer. He called the bank and found out Michael was stealing money from them.

Mother stated none of her children were calling her "that [she] can remember." No one told her Joyce was trying to call her. She did not remember if anyone told her that Michael or Andrew called to speak with her. She did not think Joyce or Andrew would want to visit with her. Mother said she and Andrew "were very close, but not anymore." She added, "That is [Michael's] work. Everybody must be promised the money that he gets in this lawsuit. And he has everybody now on his side. Before, they were all against him. And now he seem[s] to have promised all the kids that he's winning this and they're getting the money." After Mother stated she and Father owned the Bakkers' residence, the following colloquy occurred.

8

"Q. Did you ever want [Michael] to have it after you pass away?

"A. After we all passed away.

"Q. Okay. So you signed papers -- do you remember signing papers saying that, after you all pass away, that [Michael] gets the house?

"A. Not [Michael].

"Q. Not [Michael]?

"A. Never [Michael] alone.

"Q. So who?

"A. All the kids.

"Q. So you wanted all the kids to get the [Bakkers' residence] after you pass away?

"A. Yeah.

"Q. And did you want all the kids to get equally?

"A. Of course.

"Q. And did you want all the kids to get all of your assets equally?

[¶] . . . [¶]

"A. Yeah."

Mother denied she and Father signed a document giving Michael joint tenant ownership in the Bakkers' residence. She did not know of anything Michael did improperly concerning the Whitman Property, but she heard Girlfriend did and "[s]he steals."

One exhibit was a report from neuropsychologist Stephanie Moore dated August 2, 2014, 11 days before the Bakkers executed the 2014 Trust Amendment. Moore stated she evaluated Mother and she knew "the bounty of her estate" and "retains all forms of decisional capacity," and her decision to amend her Trust was "not the result of the influence of others." Two other exhibits were Fall 2015 visit reports from Marla

Feldman, a gerontologist, who stated Mother was "mentally intact," clearly expressed her preferences and likes, and "show[ed] no signs of cognitive impairment."

*4. Jeffrey's Testimony*

Jeffrey testified he lived at Gaby's residence. Jeffrey stated that on July 21, 2014, Mother walked from the Bakkers' residence across the street, knocked on the door, and said she needed help. He said Mother, who was upset, told him, Gaby, and Joyce, "'I think [Michael] is stealing again. Please help me.'" He added that Mother was concerned Michael was going to poison her.

Jeffrey testified he worked in a law firm during 2013, and he told Mother problems arise when children have to resolve their parents' financial affairs. When Michael asked Jeffrey whether he told Mother that her will and testament were incomplete, Jeffrey stated he could not remember. When presented with a transcript of his testimony from *Bakkers I, supra,* G054865, to refresh his recollection, Jeffrey admitted he may have told her that. Jeffrey also admitted he told Mother he saw blanks and handwriting on her will and trust, and Michael had control. Jeffrey stated he told Mother that he wanted to help her but he could not if Michael was involved. He also told Mother that her will and trust left half of everything to Girlfriend. When Mother asked him whether they needed a lawyer, Jeffrey said, "Yes." Jeffrey testified he saw handwriting on the trust. When shown the 2013 Trust Amendment, the wills, the powers of attorney, and health care directives, Jeffrey admitted they did not have blanks, crossovers, or handwriting. Jeffrey testified he saw handwriting on the will. Jeffrey testified he found an attorney to help his grandparents with their trust. He went to her office a few times but only his grandparents were in the room with the attorney when discussing and signing the 2014 Trust Amendment. Jeffrey said he did not read the 2014 Trust Amendment until after they left.

10

*5. Gaby's Testimony*

Gaby testified she began to be paid as a caregiver for her parents in 2013 and they moved into her house in June 2014. Gaby stated they initially payed her $600 per month but it increased to $5,600 per month. She provided for their daily needs and managed their finances. Michael questioned Gaby about three deeds of trust totaling $312,000. Gaby said her parents paid that amount, placed a $200,000 lien on her property, and forgave the balance, $112,000. She made $600 payments to her parents, but she could not remember whether she paid the amount off. She added though she did not have a mortgage and her parents forgave the amount. When Michael asked her about the language of the 2014 Monetary Gift, Gaby said it was her handwriting. Gaby stated Mother wanted to reconvey Gaby's residence to her, Jeffrey drafted it, and she read the document to her parents. She could not remember which parts she read to them. Gaby admitted she knew her parents had a trust attorney for many years, but that Jeffrey found a new attorney to assist Mother.

*6. Trial Court's Ruling*

In its statement of decision, the trial court ruled for Michael, Andrew, and Joyce. At the outset, the court opined Gaby and Jeffrey were not credible, Andrew and Joyce were credible, and Michael's credibility was suspect. The court provided both the statutory and common law tests for undue influence and a detailed recitation of the trial testimony. The court stated the Bakkers were a vulnerable elderly couple who were in deteriorating health and moved in with Gaby so she could care for them. Specifically, Gaby had to read to Mother, who was blind. Jeffrey, who Mother believed was studying law, told her, incorrectly, that her Trust had blanks and was incomplete, and Girlfriend stood to inherit half of her estate. Numerous family members, including Gaby and Jeffrey, convinced Mother that Michael was stealing from her. Jeffrey found the attorney who assisted Mother in disinheriting Michael and leaving her estate to Gaby, Andrew, and Joyce. Later, Mother went to another attorney that eventually resulted in only Gaby

11

and Jeffrey sharing the Bakkers estate, although Mother later stated she intended her four children to share their assets equally.

The court concluded that under both theories, there was clear and convincing evidence Gaby and Jeffrey unduly influenced Mother. The court explained the evidence established Gaby isolated her parents from Joyce and Andrew. The court added the evidence demonstrated Jeffrey lied to Mother about her beneficiaries and told Mother that Michael was stealing from her. The court stated that although neither Gaby nor Jeffrey participated in the meeting with their attorneys, they did not overcome the evidence they unduly influenced Mother. The court opined the 1989 Trust and the 2013 Trust both provided the bulk of the Trust assets must be divided equally among the four children. The court concluded that regardless of what Mother signed after that, it was her intent to distribute their assets equally to her four children. The court ruled the 2014 Trust Amendment, the 2014 Power of Appointment, the 2015 Power of Appointment, the 2014 Reconveyance, and the 2014 Monetary Gift were all invalid.

DISCUSSION

I. *Miscellaneous Matters*

Gaby and Jeffrey's opening brief is not the model of clarity and violates the California Rules of Court. As we explain below in greater detail, it does not include a summary of all the significant facts, which is mandatory in all opening briefs. (Cal. Rules of Court, rule 8.204(a)(2)(C); see *Kleveland v. Siegel & Wolensky, LLP* (2013) 215 Cal.App.4th 534, 558 [appellants failure to provide summary of significant facts violated court rules and justified sanctions]; *Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 166 [recitation of facts improper because not in summary style and included argument].)

Instead, its statements of fact, which comprises pages 12-28, and is titled, "The Evidence at Trial Does not Establish Undue Influence," is argument that masks as

12

facts. Two subheadings are worth mentioning.[6] Subheading F is titled, "The trial court improperly admitted an uncertified translation." Subheading G is titled, "The trial court improperly admitted Andrew [*sic*] and Joyce's hearsay." These subheadings, which include argument, are noteworthy because they are included in what purports to be a statement of facts, but they are not included in their legal analysis section that begins on page 29. Their argumentative presentation of the limited facts they provide violates the California Rules of Court. Failing to include these arguments in the legal analysis section forfeits appellate review of them. (See *Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1294 [failure to address issue independently under separate heading in discussion section may forfeit argument]; Cal. Rules of Court, rule 8.204(a)(1)(B).)

In any event, their claims are meritless. As to translation of the May 2013 family meeting from Dutch to English, there is no requirement the meeting had to be translated by a court certified Dutch translator. Dutch is not one of California's certified languages. (Jud. Council of Cal., Operations and Programs Division, 2020 Language Need and Interpreter Use Study (Mar. 2020), p. 11, fn. 9 [listing California certified languages] <https://www.courts.ca.gov/documents/2020-Language-Need-and-Interpreter-Use-Study-Report-to-the-Legislature.pdf> [as of Nov. 2, 2020].) Gaby and Jeffrey cite to California Rules of Court, rule 3.1110(g)'s requirement a translation must be certified under oath by a qualified interpreter. It was. The interpreter signed a declaration stating she was a California registered court interpreter. Additionally, the Bakkers intent in May 2013 was relevant evidence and explained their thinking just months before they executed the 2013 Trust. (*Estate of Aiello* (1980) 106 Cal.App.3d 669, 676 [letters hearsay but admissible pursuant to Evidence Code section 1250 as declarant's then existing mental state].)

---

[6] We have omitted initial capitalizations throughout.

With respect to Andrew's and Joyce's testimony at the restraining order hearing, Gaby and Jeffrey's trial counsel did not argue the witnesses were available at trial. Counsel simply argued the transcript was hearsay, not properly authenticated, and not a certified copy. Counsel forfeited appellate review of this issue when he failed to object on this basis below. (*Cinnamon Square Shopping Center v. Meadowlark Enterprises* (1994) 24 Cal.App.4th 1837, 1844 [party not free to change theory of recovery or relief on appeal.])

## II. *Sufficiency of the Evidence*

Criticizing the trial court for not "drill[ing] down" on when the documents were prepared, Gaby and Jeffrey argue insufficient evidence supports the trial court's conclusion there was clear and convincing evidence they procured the documents through undue influence. Not so.

Generally, California law allows a testator to dispose of her/his property as she/he sees fit regardless of whether the dispositions specified are fair or proper. (*Estate of Sarabia* (1990) 221 Cal.App.3d 599, 604 (*Sarabia*), superseded by statute on other grounds as stated in *Rice v. Clark* (2002) 28 Cal.4th 89, 96-97 (*Rice*).) This presumption can be overcome if it is established the testator was affected by undue influence. (*Sarabia, supra,* 221 Cal.App.3d at p. 604.) Undue influence is pressure brought to bear directly on the testamentary act sufficient to overcome the testator's free will amounting to coercion destroying the testator's free agency. (*Rice, supra,* 28 Cal.4th at p. 96.)

Undue influence may be established in two ways. First, the person challenging the testamentary instrument may submit direct or circumstantial evidence demonstrating a number of factors that in combination support the inference of undue influence. (*David v. Hermann* (2005) 129 Cal.App.4th 672, 684 (*David*).) Those factors include the victim's vulnerability, the influencer's apparent authority, the influencer's actions or tactics, and the fairness of the result. (Welf. & Inst. Code, § 15610.70.) Additionally, it is important the chief beneficiaries actively procured the instrument to be

14

executed. (*David, supra,* 129 Cal.App.4th at p. 684.) The person contesting a trust bears the burden of proving undue influence by clear and convincing evidence. (*Estate of Clementi* (2008) 166 Cal.App.4th 375, 384.)

Second, a presumption of undue influence may arise shifting to the proponent of the disposition the burden of proving by a preponderance of the evidence the donative instrument was not procured by undue influence. (*Rice, supra,* 28 Cal.4th at p. 97.) The presumption of undue influence arises if the challenger establishes the following: "(1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument. [Citations.]" (*Ibid.*)

"When determining whether there is sufficient evidence to support the trial court's finding of undue benefit, we follow established rules of appellate review: We view factual matters most favorably to the prevailing party and in support of the judgment. We defer issues of credibility to the trier of fact. Additionally, we resolve all conflicts in the evidence in favor of the respondents. [Citation.] Our power 'begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion' reached by the trier of fact. [Citation.]" (*Estate of Auen* (1994) 30 Cal.App.4th 300, 311 (*Auen*), superseded by statute on other grounds as stated in *Rice, supra,* 28 Cal.4th at pp. 96-97.)

"An appealed judgment is presumed correct, and the appellant must affirmatively demonstrate error. [Citation.] An appellant challenging the sufficiency of the evidence to support the judgment must cite the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law. [Citations.] An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient. The fact that there was substantial evidence in the record to support a contrary finding does not compel the conclusion that

15

there was no substantial evidence to support the judgment. An appellant . . . who cites and discusses only evidence in [their] favor fails to demonstrate any error and waives the contention that the evidence is insufficient to support the judgment. [Citations.]" (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.)

Here, Gaby and Jeffrey fail to cite and discuss the evidence supporting the judgment. They do not discuss Michael's, Andrew's, or Joyce's testimony. They do not discuss evidence of Father's and Mother's advanced age or health. They do not discuss Mother's testimony she relied on Gaby to read to her and tell her where to sign documents. They do not discuss evidence Jeffrey told his blind grandmother he worked at a law firm and her Trust was incomplete. Instead, they provide a self-serving recitation of those facts that support their desired outcome. Their failure to acknowledge or mention the conflicting testimony and other evidence supporting the judgment, and lack of explanation as to why such evidence was insufficient as a matter of law, is fatal to their sufficiency of the evidence claim. Thus, we conclude substantial evidence supported the finding Gaby and Jeffrey procured the documents through undue influence.

In any event, substantial evidence supported the trial court's conclusion Gaby and Jeffrey exerted undue influence over Mother under either theory. We begin with the court's determination Gaby and Jeffrey were not credible.

The evidence demonstrated the statutory elements were satisfied. At the time of the 2014 Trust Amendment, the Bakkers were both in their early 90s. Father had dementia, and Mother was blind. Thus, the Bakkers were vulnerable to undue influence. Additionally, Gaby and Jeffrey exercised authority over the Bakkers. The Bakkers lived with Gaby and Jeffrey. Because Mother was blind, Gaby had to read to her. At her deposition, Mother testified Gaby would tell her where to sign documents. Jeffrey told Mother that he was studying the law, suggesting he possessed some experience in estate planning.

16

Furthermore, Gaby's and Jeffrey's actions demonstrate they unduly influenced Father and Mother. Gaby and Jeffrey isolated the Bakkers from three of their children while they lived in Gaby's residence. At trial, Jeffrey admitted he told Mother her Trust documents were incomplete and had blanks and handwriting, but when presented with all the documents conceded they did not have blanks, handwriting, or crossouts. Jeffrey incorrectly told his grandmother that Girlfriend, who she did not like, would get half of her assets.

And the evidence supported the conclusion Gaby and Jeffrey actively procured the documents benefitting them. Gaby and Jeffrey complain the trial court did not evaluate whether they unduly influenced Mother when they procured each document. (*Estate of Welch* (1954) 43 Cal.2d 173, 175-176 [undue influence at time will was made].) Gaby and Jeffrey did more than drive Mother to the attorneys' offices. (*Estate of Lingenfelter* (1952) 38 Cal.2d 571, 586 [merely accompanying testator to lawyer's office insufficient to establish undue influence].) The record supports the conclusion that Gaby and Jeffrey embarked on a campaign to unduly influence the Bakkers from the moment they moved in with her. After they moved in with Gaby, who isolated them from their other children, the Bakkers executed four of the five documents in question. Again, Jeffrey told his grandmother that her Trust documents were incomplete, but they were not. Jeffrey selected the attorney to assist Mother. Jeffrey and Gaby took Father and Mother to the attorney who assisted the Bakkers with the 2014 Trust Amendment. Mother, who relied on Gaby to read to her and tell her where to sign, testified she did not forgive any debt of Gaby's, yet the Bakkers executed the 2014 Monetary Gift, a document Gaby admitted she wrote. Although Mandel spoke with Mother alone, Gaby and Jeffrey assisted Mother in the meeting with Mandel and in executing the 2014 Power of Appointment and the 2015 Power of Appointment, both of which benefitted Gaby and Jeffrey.

17

Finally, the result was unfair. Although in May 2013 Gaby stated she did not want to be involved with her parents estate planning, in August 2014 she was assisting her parents in amending their Trust to disinherit Michael and increase her share of their assets. Eight months later, she and her son had control of the Bakkers assets. At her deposition five months later, Mother stated she wanted her four children to share their estate equally. That is not what the Trust documents provided. At the hearing on the restraining order, just two months after the Bakkers amended their trust to disinherit Michael and increase Gaby's percentage of inheritance, Mother testified the Trust was not recently modified or changed. Finally, Gaby and Jeffrey assert they did not unduly profit because the Bakkers wanted to provide for Gaby because she cared for them. The evidence demonstrated the Bakkers paid her to care for them.

The same evidence established the presumption arose. Gaby and Jeffrey clearly had a confidential relationship with Mother. They actively participated in procuring the documents that benefitted them. Because the presumption of undue influence arose, the burden shifted to Gaby and Jeffrey to prove by a preponderance of the evidence the donative instruments were not procured by undue influence. They failed. Although the evidence demonstrated Mother met with both attorneys alone, the damage was done. Gaby and Jeffrey isolated nonagenarian Mother from her children, and Jeffrey posed as an aspiring lawyer to convince his grandmother her Trust was incomplete and a non-family member who she did not care for would share half of her estate. Meeting with attorneys without Gaby and Jeffrey could not undo the isolation and fear their undue and improper influence instilled in her.

Gaby and Jeffrey argue Mandel's testimony alone establishes they did not unduly influence Mother in procuring the documents. They also rely on Moore's and Feldman's statements regarding Mother's mental capacity. The trial court heard, considered, and necessarily found their testimony lacking. Whether or not the

18

presumption of undue influence has been dispelled is one of fact for the trial court. (*Auen, supra,* 30 Cal.App.4th at p. 311; *Estate of Gecht* (1958) 165 Cal.App.2d 431, 444-445.)  The fact the trial court did not prove a detailed recitation of Mandel's testimony, or mention Moore's or Feldman's, does not alter our conclusion.

Gaby and Jeffrey criticize the trial court for basing its conclusion on Mother's deposition testimony in October 2015, after all the documents were executed, that she wanted all her children to share her assets.  But they hang their hat on Mother's testimony during the same deposition that she wanted Gaby and Jeffrey to get her assets upon her death.  This inconsistency only serves to illustrate an aging person who was unduly influenced.  Again, at the hearing on the restraining order 10 weeks after executing the 2014 Trust Amendment, Mother insisted she and Father did not amend the 2013 Trust.

## DISPOSITION

The judgment is affirmed.  Respondent shall recover his costs on appeal.


O'LEARY, P. J.

WE CONCUR:


THOMPSON, J.


GOETHALS, J.

19