Filed 10/9/25  Perez v. Perez CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re THE FRED PEREZ LIVING TRUST<br><br>MARIA PEREZ,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>LAURA PEREZ,<br><br>    Defendant and Respondent. | B335561, B338961<br><br>Los Angeles County Super. Ct. No. 19STPB10532 |

APPEAL from an order of the Superior Court of Los Angeles County, Ana Maria Luna, Judge.  Affirmed.

Law Offices of Kaplan, Kenegos & Kadin and David Scott Kadin for Plaintiff and Appellant.

Driskell, Gordon & Fetchik and Robert L. Driskell for Defendant and Respondent.

This appeal arises from appellant Maria Perez's petition challenging the validity of the Fred Perez Living Trust (the trust), created by her late husband, Fred Perez. After a bench trial, the trial court ruled against Maria and in favor of respondent Laura Perez, who is Fred's adopted daughter from a prior relationship, as well as the trust's successor trustee and sole beneficiary. The court found: (1) the trust did not fail due to insufficient funding, as Fred's inter vivos transfer of his interest in his home to the trust was valid; (2) Fred had sufficient capacity to create the trust; and (3) Laura proved by clear and convincing evidence that the trust was not the product of undue influence on her part, rebutting the presumption set forth in Probate Code section 21380.[1]

On appeal, Maria challenges each of these findings. We reject her contentions and affirm.

## BACKGROUND

Fred and Maria were married in April 1984. While they have no children together, they each have children from prior relationships. Maria has a daughter. Fred has three sons who are not parties to this appeal. Laura is Fred's adopted daughter from a prior marriage.[2] Fred met Laura when she was seven

---

[1] Undesignated statutory references are to the Probate Code. We refer to the parties by their first names for clarity.

[2] The trial court found that Laura was adopted by Fred in Mexico before she came to the United States. It also found that Fred received Laura into his home and openly held her out as his daughter for 40 years. Maria's opening brief solely references this finding in its summary of the trial court's statement of decision, where it asserts the court "erroneously determined Laura to be Fred's adopted daughter without any documentary

2

years old.  He brought Laura to the United States with her mother and continued to raise her after her mother died.  Except for a three-year period in the 1990s, Laura has resided in the family home located at 1241 North Azusa Avenue, Azusa (the property), since its purchase in April 1994.  Laura, Fred, and Maria lived together until Fred's death in October 2018, after which Maria moved out of the property.

Maria and Fred purchased the property using earnings from their lawn care business.  Title to the property was originally held by Laura and Fred as joint tenants.  By way of a quitclaim deed recorded in July 1997, Fred and Laura conveyed the property to Fred and Maria, husband and wife, as joint tenants.  Subsequently, through a quitclaim deed recorded in March 2017, Maria transferred her interest in the property from herself, as joint tenant, to herself as her sole separate property.

In November 2017, Fred met with attorney Priscilla Solario twice.  At the second meeting held on November 29, 2017, Fred created the trust, which was funded with "[a]ny and all interest that in [*sic*] the real property located at 1241 North Azusa Avenue, Azusa, California" and "[a]ll articles of personal and household use and ornament of every kind and description and wheresoever situated."  In conjunction with the trust agreement, Fred executed a grant deed conveying his interest in the property as "a married man" to himself as the trust's trustee.

The trust designated Fred as its trustee and designated Laura as its successor trustee.  Laura was also designated the sole beneficiary entitled to the trust's assets—including Fred's

---

evidence."  We treat this contention as forfeited, as it is unaccompanied by reasoned analysis supported by citations to legal authority.  (*L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 620.)

3

"principal residence located at 1241 North Azusa Avenue, Azusa, California"—upon his death. The trust expressly disinherited Maria, two of Fred's biological sons, and their respective issue.

Fred died in October 2018. Through a grant deed recorded in November 2018, Laura, as the trust's successor trustee, conveyed the property to herself as "a single woman as her sole and separate property . . . ."

In November 2019, Maria filed a petition under sections 17200 and 850, seeking an order determining the trust's validity, imposition of constructive trust, and attorney fees and costs. Maria asserted the trust was invalid because (1) Fred lacked sufficient capacity to create the trust in November 2017; and (2) Laura unduly influenced Fred to create the trust. Laura objected to the petition.

During the bench trial on the petition, Maria's counsel orally moved to amend the petition to assert an additional ground challenging the trust's validity. Specifically, counsel sought to add the allegation that the trust was invalid due to insufficient funding and lack of viable assets, as Fred's transfer of his interest in the property to the trust was invalid. The trial court granted the motion.

After receiving briefing on the issue presented by the petition's amendment, the trial court found that Fred and Maria owned the property as community property, and that the deeds they executed in 2017 were insufficient to transmute the property to separate property. Citing *Masry v. Masry* (2008) 166 Cal.App.4th 738 (*Masry*), the trial court further found "[m]arried persons may dispose of their share of the community without the consent of the other spouse." The court therefore found the transfer of Fred's interest in the property to the trust to be valid

4

and consequently concluded the trust did not fail due to lack of funding.

At the conclusion of the bench trial, the trial court issued a statement of decision rejecting Maria's challenges to the trust's validity. The court first reiterated that the property was Fred and Maria's community property and that per *Masry, supra*, 166 Cal.App.4th 738, Fred "was free to, and did, fund the trust with his community property interest in the [property]." It then found: (1) Laura rebutted the presumption set forth in section 21380, subdivision (a)(3), as she proved by clear and convincing evidence that the trust was not the product of undue influence on her part; and (2) the evidence to which the court gave more weight showed Fred had contractual capacity to execute the Trust agreement on November 29, 2017.

Maria appealed.

## DISCUSSION

After a bench trial, we review questions of law de novo and the trial court's factual findings under the substantial evidence standard. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) In so doing, "[w]e review the trial court's ruling, not the reasons stated for the ruling. [Citations.] The rationale for this standard is that there can be no prejudice from an error in logic or reasoning if the decision itself is correct." (*Mireskandari v. Gallagher* (2020) 59 Cal.App.5th 346, 357.)

Under the substantial evidence standard, "our review 'begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination.' " (*DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 381 (*DeNike*), italics omitted.) We do not reevaluate witness

5

credibility or reweigh the evidence.  (*Id.* at p. 382.)  We "will uphold a judgment that is supported by substantial evidence even if substantial evidence to the contrary also exists."  (*Ibid.*)

## I.     Validity of Deed Executed by Fred in 2017

Maria's principal contention on appeal is that the trial court should have found the trust invalid due to inadequate funding.  In her view, the trial court correctly found the property to be Fred and Maria's community property but improperly concluded that Fred could transfer his interest in the property to the trust during his lifetime without Maria's consent.  According to Maria, Fred could have only transferred his interest in the property to the trust if it was his separate property.  Because he and Maria never transmuted the property by following the steps required under Family Code section 852, Maria argues, the grant deed executed by Fred in November 2017 was invalid and thus the trust fails due to insufficient funding.

While Maria's argument raises a few valid points, it ultimately misses the mark.  She correctly observes that Fred lacked the authority to transfer his interest in the property to the trust during his lifetime without her consent.  Although not cited in her appellate briefs, the conveyance violated Family Code section 1102, subdivision (a), which requires both spouses "to join in executing an instrument by which . . . community real property or an interest therein is . . . sold, conveyed, or encumbered."  Further, as Maria suggests, *Masry* is inapplicable here and does not hold that a spouse may unilaterally dispose of an interest in community property.  (See *Masry*, *supra*, 166 Cal.App.4th at p. 743 [husband satisfied section 15401, subdivision (a)(2) and validly revoked a family trust by delivering written notice of revocation to himself as trustee].)

6

But contrary to Maria's argument, the validity of the conveyance in question does not hinge upon whether Fred transmuted his interest in the property from community to separate property. The transfer of community property to a third-party by one spouse without the consent of the other "is not void, but *voidable*." (*Blethen v. Pacific Mut. Life Ins. Co.* (1926) 198 Cal. 91, 99.)[3] Consequently, the transfer remains effective unless the non-consenting spouse sets it aside. (See *id*; 4 Miller & Starr, Cal. Real Estate (4th ed. 2025) § 11:57.) The question therefore is whether the trial court correctly declined Maria's request in her amended petition to set aside Fred's conveyance of his interest in the property to the trust.

*Hyatt v. Mabie* (1994) 24 Cal.App.4th 541 (*Hyatt*) is instructive. There, the husband executed a promissory note secured by a deed of trust encumbering his interest in a home owned by himself and his wife as community property. (*Id.* at p. 543.) The wife was unaware of the encumbrance and discovered it after entry of the judgment dissolving the marriage. (*Id.* at p. 544.) Subsequently, the home was sold, and the wife filed suit to recover the sale proceeds owed to her former husband and the deed of trust's beneficiaries. (*Id.* at pp. 544–545.)

On appeal from the judgment entered against her, the wife argued she was entitled to the home's sale proceeds because the deed of trust was void, as it was executed in violation of former Civil Code section 5127, Family Code section 1102's predecessor

---

[3] Contrary to the assertion by Maria's counsel at oral argument, *In re Brace* (2020) 9 Cal.5th 903 does not hold that the transfer of community real property to a third-party by one spouse without the consent of the other is void *ab initio*. (See *id.* at pp. 911–912.)

7

statute. (*Hyatt*, *supra*, 24 Cal.App.4th at p. 545.) The Court of Appeal rejected her contention, reasoning: "[A] nonconsenting spouse may, during the existence of the community, invalidate in its entirety an encumbrance which does not conform to [former Civil Code] section 5127. The remedy is designed to protect the community. [Citation.] Since the community here had been dissolved before [the wife] knew of the encumbrance, [she] no longer had a right to void the encumbrance in its entirety. After dissolution of the community, [the wife's] right was limited to voiding the encumbrance to the extent only of her interest in the property. Since the encumbrance by its terms did not affect her interest in the property, the remedy of partial invalidation would not lie." (*Id.* at p. 547.)

The present case is analogous to *Hyatt*. Maria sought to invalidate the unauthorized transfer of her husband's interest in community property after the community's dissolution (i.e., Fred's death in October 2018). Under these circumstances, Maria was only entitled to set aside the transfer insofar as it affected *her* interest in the property. (See *Hyatt*, *supra*, 24 Cal.App.4th at p. 547.) Since the deed in question "by its terms did not affect her interest in the property, the remedy of partial invalidation would not lie." (*Ibid.*) For this reason, the trial court properly declined to void the November 2017 deed and correctly found that the trust did not fail due to inadequate funding.[4]

---

[4] In light of this conclusion, we need not address Maria's contention that the trial court abused its discretion by denying her motion for reconsideration based on the court's reliance on *Masry*, *supra*, 166 Cal.App.4th 738. Because the ruling was correct regardless of its reliance on *Masry*, remand for

8

## II.    Capacity

In finding Fred had sufficient capacity to create the trust in November 2017, the trial court applied the standard for contractual capacity set forth in sections 811 and 812, rather than the lower standard of testamentary capacity described in section 6100.5.  The parties do not dispute that the court applied the correct standard in making its capacity finding.

Sections 810 through 812 apply where, as here, the disputed trust instrument is "unquestionably more complex than a will or codicil."  (*Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1352−1353.)  Section 810 creates "a rebuttable presumption affecting the burden of proof that all persons have the capacity to make decisions and to be responsible for their acts or decisions."  (§ 810, subd. (a).)  The party seeking to prove a person's "incapacity to contract, to make a conveyance, . . . or to execute trusts" must show that the person has a deficit in one or more of the mental functions set forth in section 811, subdivision (a), and that "the deficit, by itself or in combination with one or more other mental function deficits, significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question."  (§ 811, subd. (b).)  In evaluating capacity, courts may consider "the frequency, severity, and duration of periods of impairment" arising from a mental function deficit.  (*Id.*, subd. (c).)  "The mere diagnosis of a mental or physical disorder shall not be sufficient in and of itself to support a determination that a person . . . lacks the capacity to do a certain act."  (*Id.*, subd. (d).)

---

reconsideration would be futile.  (See *C.H. Duell, Inc. v. Metro-Goldwyn-Mayer Corp.* (1932) 128 Cal.App. 376, 385.)

While section 811 relates both to a person's capacity to make decisions and his or her capacity to perform certain acts, section 812 pertains only to the former. Section 812 provides that a person has mental capacity to make decisions if he or she is able to communicate the decision while understanding and appreciating (1) the rights, duties, and responsibilities created or affected by decision; (2) the probable consequences for the decisionmaker and any persons affected by the decision; and (3) the significant risks, benefits, and reasonable alternatives involved in the decision. (§ 812, subds. (a)–(c).)

In challenging the trial court's capacity finding, Maria essentially asks us to reweigh the evidence presented on the issue. She asserts that, rather than giving it minimal weight, the court should have accepted the testimony of her expert, Dr. Gary Freedman-Harvey, opining Fred "lacked the capacity to understand and appreciate" the documents he signed on November 29, 2017 "based on his history of dementia." She further argues that the court should have disregarded attorney Solario's testimony relating to Fred's capacity based on her observations during their meetings.

We reject Maria's contentions. The trial court was entitled to reject Dr. Freedman-Harvey's opinion even though Laura did not present an expert of her own to rebut it. "As a general rule, '[p]rovided the trier of fact does not act arbitrarily, he may reject *in toto* the testimony of a[n] [expert] witness, even though the witness is uncontradicted. [Citations.]' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890.) The statement of decision reflects that—far from being arbitrary—the court's rejection of Dr. Freedman-Harvey's opinion was thoughtful and deliberate. After summarizing Dr. Freedman-Harvey's and

10

Solario's testimony in detail, the trial court stated it was "giving greater weight" to the latter over the former, explaining: (1) Dr. Freedman-Harvey's opinion rested entirely on Fred's medical records containing hearsay and "statements that may not have been accurately recorded . . . or taken out of context and/or supported by the conclusions of others"; and (2) Dr. Freedman-Harvey "never testified to any specific deficit or deficits set forth in . . . [s]ection 811 [subdivision] (a)(1) through (a)(4) which substantially affected Fred's decision to leave whatever interest he had in the [property] to . . . Laura."

Maria's argument also fails to appreciate that, when reviewing a finding for substantial evidence, we "do[ ] not reweigh the evidence" and must "uphold a judgment that is supported by substantial evidence even if substantial evidence to the contrary also exists." (*DeNike*, *supra*, 76 Cal.App.5th at p. 382.) As discussed below, under this standard, the trial court's factual findings must be upheld.

As of November 2017, Fred was 87 years old. In addition to numerous physical ailments, Fred had diagnoses of dementia and depression. He also had some hearing loss and refused to take his blood pressure medication. Laura testified that in 2015 and 2016, Fred was "sharp, aware, talkative, knowledgeable and able to recognize people by their names." In 2017, she testified, Fred "was still pretty lucid" but was walking slower than before.

According to Laura, Fred first expressed interest in creating a living trust 5 to 10 years before he did so, after hearing an attorney discuss trusts at the senior center he attended. Fred was referred to Solario by his sister. Laura made the initial call contacting Solario and took him to her office twice. She testified that she was only present for a portion of Fred's first meeting

11

with Solario, when "she learned that Maria had executed a quitclaim of the . . . property to herself."  At all other times, Fred met with Solario alone.  On the date he signed the trust agreement, Laura testified, "Fred was mentally sharp."

Solario testified that Fred was referred to her office by his sister.  She was contacted in November 2017—although she could not remember by whom—to discuss Fred's estate plan.  Solario communicated with Fred in Spanish at all times.  Although she could not recall whether Laura was present during her first meeting with Fred, Solario testified that she normally spoke to clients alone.

During their first appointment on November 2, 2017, Solario testified, Fred stated that he wanted to leave his share of the property to Laura, and that he had discussed his plan with Maria, noting "Laura had always paid for one-half of the [property's] mortgage, taxes, insurance, maintenance and expenses . . . ."  Fred also stated that he wanted to disinherit his sons.  Per her standard practice, and in Fred's presence, Solario then looked up the property's last recorded deed.  At that point, she informed Fred that Maria executed a deed earlier in the year which, in her view, severed Maria's joint tenancy with Fred.  Fred "immediately reacted by saying 'no wonder she's been acting strange' and repeated th[e] statement again."  Unhappy that Maria had filed the deed without telling him, Fred stated he "wanted to transfer his one-half interest in the [property] to his trust because Maria had broken the joint tenancy."

In their second meeting on November 29, 2017, Solario met with Fred in private for about 20 minutes before he signed his estate planning documents, including the trust agreement.  She confirmed that Fred wanted to leave his interest in the property

to Laura, and that he wanted her to act as his agent. Fred told Solario that he "wanted his wife and daughter to live in the [property]" and that he "thought . . . his daughter or daughter-in-law would buy out the interest of the other." Solario further testified that "Fred told her his wife and step-daughter were not treating him well" and that "his daughter-in-law was a meddler and his daughter was a good girl." Based on her interaction with Fred, Solario had no concerns regarding his ability to understand the documents he was signing that day. He "gave no indication that he had dementia" and apologized for his messy signature. Fred paid Solario for her legal services.

We conclude substantial evidence demonstrates that Fred did not have any deficits in one or more of the mental functions listed in section 811, subdivision (a), which "significantly impair[ed] [his] ability to understand and appreciate the consequences of his . . . actions" in creating the Trust on November 29, 2017. (§ 811, subd. (b).) We further conclude that substantial evidence demonstrates Fred understood the rights, duties, and responsibilities created by the trust; the consequences for himself and others arising from the trust's creation; and the significant risks, benefits, and reasonable alternatives involved his decision to create the Trust. (§ 812.) Substantial evidence therefore supports the trial court's finding that Fred had the requisite contractual capacity to create the trust.

## III. Undue Influence

The Probate Code defines "[u]ndue influence" as "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (§ 86; Welf. & Inst. Code, § 15610.70, subd. (a).) In determining whether a result was produced by undue influence,

13

courts must consider the vulnerability of the victim, the influencer's apparent authority, the influencer's actions or tactics, and the equity of the result. (Welf. & Inst. Code, § 15610.70, subd. (a)(1)–(4).) "Evidence of an inequitable result, without more, is not sufficient to prove undue influence." (*Id.*, subd. (b).) These statutory provisions supplement the common law meaning of undue influence. (§ 86.)

Under common law, undue influence refers to "pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency." (*Rice v. Clark* (2002) 28 Cal.4th 89, 96.) Mere opportunity and motive to exert influence are insufficient. (*Estate of Fritschi* (1963) 60 Cal.2d 367, 373–374.) There must be evidence showing that the influencer actively participated in procuring the preparation of the challenged instrument and exerted pressure amounting to coercion destroying the testator's free agency. (*Id* at p. 373.)

The party challenging the instrument in question ordinarily bears the burden of proving undue influence. (*Rice v. Clark, supra*, 28 Cal.4th at p. 96.) However, an instrument "is presumed to be the product of . . . undue influence" if it contains a donative transfer to "[a] care custodian of a transferor who is a dependent adult" and "was executed during the period in which the care custodian provided services to the transferor, or within 90 days before or after that period." (§ 21380, subd. (a)(3).) This "presumption may be rebutted by proving, by clear and convincing evidence, that the donative transfer was not the product of . . . undue influence." (*Id.*, subd. (b).)

The parties agree that section 21380, subdivision (a) applies here, as Laura was Fred's in-home caregiver paid by the

14

County of Los Angeles In-Home Supportive Services when he executed the trust agreement in November 2017.  The trial court found Laura rebutted this statutory presumption because she proved, by clear and convincing evidence, that the trust was not the result of undue influence.  Thus, in reviewing this finding for substantial evidence, we must "account for the clear and convincing standard of proof" and decide "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the" trust was not the product of Laura's undue influence.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012 (*O.B.*); § 21380, subd. (b).)

In support of its undue influence finding, the trial court acknowledged that Maria and Laura offered conflicting testimony relating to Fred's wishes and concerns regarding the property's disposition after his death.  Based on the content of their testimony and demeanor on the witness stand, the court found Laura to be more credible.  It also reiterated the minimal weight it had accorded Dr. Freedman-Harvey's testimony.  Thus, relying largely on Laura and Solario's testimony relating to the circumstances surrounding the trust's creation, the trial court found that while Fred and Laura shared a confidential relationship, Laura played no active role in urging Fred's creation of the trust and had no involvement in the formulation of the trust agreement's terms.

The gravamen of Maria's argument is that we should disregard the trial court's credibility findings and rely instead on the testimony by Maria, Dr. Freedman-Harvey, and Fred's daughter-in-law to conclude Laura unduly influenced Fred to create the trust leaving his interest in the property to Laura on his death.  This we cannot do.  Maria's contention fails because

15

she improperly asks us to disregard the applicable standard of review. (See *O.B.*, *supra*, 9 Cal.5th at p. 1008 [in reviewing a finding made under the clear and convincing evidence standard, we "do[ ] not reweigh the evidence" and "may not insert [our] own views regarding the credibility of witnesses in place of the assessments conveyed by the judgment"].)

Applying the correct standard, we conclude there is "substantial evidence from which a reasonable trier of fact could have found it highly probable" that Laura did not use excessive persuasion or exert pressure on Fred to overcome his will and effectively coerce him into creating the trust. (*O.B.*, *supra*, 9 Cal.5th at p. 996.) As discussed above, the evidence credited by the trial court shows that Fred developed the idea to create a trust on his own, based on an attorney-led discussion he had attended at his senior center. He was referred to Solario by his sister. Laura made initial contact with Solario and drove him to their meetings. Her involvement ends there. For the most part, Fred spoke to Solario alone. He expressed his testamentary wishes outside of Laura's presence, explaining to Solario that he desired to leave his interest in the property to Laura based on her payment of the property's expenses, his positive relationship with her, and his view that he had been mistreated by Maria and his step-daughter. Fred likewise signed the trust agreement outside of Laura's presence. And Fred—not Laura—paid for Solario's legal services.

Substantial evidence therefore supports the trial court's finding that Laura proved, by clear and convincing evidence, the trust was not the product of Laura's undue influence.

16

## DISPOSITION

The April 2, 2024, order finding The Fred Perez Living Trust to be valid is affirmed.  Respondent shall recover her costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TAMZARIAN, J.

We concur:

COLLINS, Acting P. J.

VAN ROOYEN, J.*

---

\*     Judge of the San Luis Obispo Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17